Submitted on briefs May 18, reversed October 19, objections to
cost bill overruled November 16, 1955

# STATE OF OREGON (Substituted for Carbaugh) *v.*
# CUMMINGS

288 P. 2d 1036
289 P. 2d 1083

*Millen F. Kneeland, Maurice C. Corcoran* and *Gale A. Lockhart, Jr.,* of Portland, for appellant.

*Robert Y. Thornton,* Attorney General of the State of Oregon, and *Lloyd G. Hammel,* Assistant Attorney General, for respondent.

ROSSMAN, J.

This is an appeal by Charles K. Cummings, one of the two defendants, from a judgment which the circuit court rendered against him in the amount of $5,000 after it had entered findings of fact and conclusions of law. The subject matter of the action was an alleged indebtedness of $5,000 which, the complaint avers, was evidenced by a writing, dated October 5, 1951, signed by the defendants and which acknowledged to one Mary F. Burrell an indebtedness of $5,000. The complaint denominates the writing a "demand promissory note." The plaintiffs in the action are, respectively, the executor and executrix of the estate of the aforesaid Mrs. Burrell, who died testate November 24, 1951. The defendants in the action are the aforementioned

Charles K. Cummings and his wife, Marjorie I. Cummings. The judgment ruled that "the complaint be dismissed as to the defendant Marjorie I. Cummings."

Subsequent to the entry of the challenged judgment, the probate court made a distribution of the assets of the decedent's estate in accordance with the decedent's will whereby the State of Oregon, on behalf of one of its agencies, received the residue of the estate. The residue included the aforementioned "demand promissory note." At that juncture, the State, upon its motion, was substituted as plaintiff-respondent. Notwithstanding the substitution, we will, for the sake of convenience, refer to the executor and executrix as the plaintiffs.

The following is a reproduction of the abovementioned writing as it was presented at the trial:

The instrument, as quoted in the complaint, omitted the superscription, "Void in the event of my death—Mary F. Burrell."

The defendants concede that the defendant-appellant, Charles K. Cummings, hereafter designated simply as Cummings, wrote the part of the instrument which the plaintiffs term a demand promissory note, that is, the part which reads:

"October 5, 1951. For value received I owe Mary F. Burrell the sum of Five Thousand and no/100 Dollars. Together with interest thereon at the rate of six per cent per annum from October 3, 1951 to the date of payment. $5000.00

Chas. K. Cummings
Marjorie I. Cummings.''

They also concede that both of the defendants signed the instrument. The plaintiffs freely admit that the decedent, Mrs. Burrell, wrote across the face of the instrument "Void in the event of my death—Mary F. Burrell.'' For example, their reply says:

"Plaintiffs admit that Mary Elizabeth Forbes Burrell wrote across the face of the note set forth in plaintiffs' complaint the words, 'Void in the event of my death—Mary F. Burrell.' ''

At the beginning of the trial in the circuit court, the plaintiffs offered to stipulate concerning many of the facts that are involved in the controversy and the defendants acquiesced in their offer. One of the facts which the parties stipulated in that manner was that Mrs. Burrell wrote upon the alleged demand promissory note the words, "Void in the event of my death'' "simultaneously'' with the execution of the instrument. Cummings swore that it was understood before the paper was written that he would write the part which he penned and that Mrs. Burrell would write and sign the part which appears in her handwriting.

By glancing at the paper, it will be seen that it constitutes an acknowledgment by the Cummingses of an

indebtedness to Mrs. Burrell in the amount of $5,000 and a release of the debt by Mrs. Burrell conditional upon her death. We do not deem it essential that we should select a name for the paper, but for the sake of convenience we may refer to it as the paper, the agreement, or the acknowledgment of indebtedness.

To facilitate an understanding of the foregoing and of other facts which we will shortly recount, we explain that Mrs. Burrell loaned to Mr. and Mrs. Cummings $5,000 October 5, 1951. The paper above quoted bears date of October 5, 1951, but it was not written, signed and delivered until two days later, that is, on October 7, 1951. Accordingly, it appears that (1) on October 5, Mrs. Burrell loaned the Cummingses $5,000; (2) two days later, that is, October 7, Cummings prepared the part of the paper which the plaintiffs deem a promissory note and on that day the Cummingses signed it; (3) before signing, the paper was handed to Mrs. Burrell who wrote the superscription over the part which Cummings had written; and (4) the writing of the document and the signatures of the parties to it were simultaneous acts.

The Cummingses agree that the paper bound them to repay to Mrs. Burrell, upon her demand, all or any part of the borrowed sum, together with interest thereon at six per cent per annum, but insist that upon her death their liability ended and that they owe nothing to her estate. The plaintiffs acknowledge that Mrs. Burrell did not want the Cummingses to be required to repay any part of the $5,000 which might remain unpaid at the time of her death. For instance, their brief says:

> "That deceased desired to forgive the appellant of the loan upon her death has not been questioned."

The brief explains:

"The record shows that deceased had a great deal of affection for appellant, his wife and family. The deceased was a generous woman who wanted to do something for her 'children' that would enable them to make a mark for themselves and consequently give her some vicarious satisfaction."

Notwithstanding (1) that Mrs. Burrell herself wrote across the face of the paper, the moment it was handed to her, the superscription which, upon her death, terminated the duty to repay, and (2) that Mrs. Burrell died before this action was filed, the plaintiffs instituted this proceeding to recover judgment for the full sum, $5,000, remaining unpaid upon her death. They grant that when Mrs. Burrell wrote the superscription she was competent, knew what she was doing, understood the import of her words and intended that the Cummingses should not be required to pay anything upon the obligation after her death.

The answer, after acknowledging that the defendants signed the paper above quoted, alleges that they performed "all things and conditions required of them to be done and performed by the agreement." In referring to the paper, it avers:

"The instrument incorporated herein by reference Exhibit 'A', show upon its face that said instrument did not become an asset of the estate of Mary Elizabeth Forbes Burrell, that it was and is an obligation personal to the deceased and defendants are not obligated in any way to pay any sum whatever to the plaintiffs."

The defendants contend that "the entire record establishes a bilateral contractual agreement limiting the debt to the lifetime of Mary F. Burrell."

Upon the other hand, the plantiffs-respondents say that the words which the defendants wrote and signed

contained no provision that "the same should be cancelled in the event of the death of said Mary F. Burrell." They declare that the superscription which Mrs. Burrell penned was not a part of the agreement which was effected orally October 5 when Mrs. Burrell handed the defendants $5,000. We will later review the evidence and in doing so will take note of what was said on and before October 5. Although the parties stipulated in the circuit court that Mrs. Burrell made the superscription simultaneously with the execution of the agreement, the plaintiffs insist, as we have just seen, that the superscription did not become a part of the agreement. Their brief classifies the part penned by Mrs. Burrell in this manner: "It was a unilateral decision by the deceased and not a part of any mutual agreement." Pursuing their contention that the writing which Mrs. Burrell inscribed upon the paper was not "a part of any mutual agreement", the plaintiffs argue that it lacked consideration. Thus, it is the plaintiffs' position that the little slip of paper described above contains two memorandums in the form of agreements written and executed simultaneously. The one agreement, according to them, bound the defendants to pay, upon demand, $5,000 together with six per cent interest. The plaintiffs treat that agreement as valid, complete and supported by adequate consideration. The part penned by Mrs. Burrell affecting repayment was no part, so the plaintiffs maintain, of the acknowledgment of indebtedness. The plaintiffs' brief, speaking of the principles of law which they believe control the case, says:

"Throughout this proceeding the estate of the deceased has contended that the agreement was ineffective as a gift inter vivos or causa mortis and ineffective as a testamentary disposition. Appellant has accepted this but vacillated between con-

tending that the voiding of the debt was a part and parcel of the entire agreement and contending that it was a separate contemporaneous agreement supported by valid consideration. The trial judge found the facts to be that there was no agreement between the deceased and appellant in this matter, but that it was 'decided' by the deceased alone. This finding is supported by the evidence as previously discussed.''

The defendants, as we pointed out in preceding paragraphs, urge that the memorandum contains, not two, but only one agreement. According to them, the words written by Cummings and those contributed by Mrs. Burrell were component parts of a single agreement.

The appellant presents three assignments of error. The first is based upon the denial of the defendants' motion for a nonsuit. The second is expressed in this way:

"The Court erred in not finding as a fact that the provision 'Void in the event of my death— Mary F. Burrell' was made and executed contemporaneously with the remainder of said agreement for a good and valid consideration.''

The third follows:

"The findings of facts do not support the judgment.''

We shall now consider the first and second assignments of error.

■ It was the plaintiffs who produced upon the trial the writing previously quoted upon which this case is based. At the very beginning of the trial they offered it in evidence and it was received without objection. Thus, the acknowledgment of debt, as presented by the plaintiffs, contained no express promise to pay

$5,000 or any part thereof, but it included a condition excusing payment to Mrs. Burrell's estate. No effort has been made by suit or otherwise to reform the instrument. Generally, an unconditional acknowledgment of a debt implies a promise to pay the debt to the person favored by the acknowledgment: *Miller v. Jones* (Neb), 290 NW 467, 127 ALR 646, and annotation 127 ALR 650. But, when the plaintiffs produced the paper; to the aid of which they invoked an implied promise to pay the deceased's estate $5,000, they were confronted with the words "Void in the event of my death" written across its face. This action was not instituted by Mrs. Burrell; her death had occurred before the complaint was filed. The very event, death, which she foresaw when she entered into the transaction at bar and for which she made provision by writing "Void in the event of my death" had taken place before the suit was instituted. Thus, we see that when the paper was presented to the court as the foundation for the relief which the plaintiffs sought, it contained no express promise for payment but bore, in the handwriting of the decedent, a provision that the instrument should be deemed void if her estate sought to collect upon it. In that way, Mrs. Burrell, by her own pen, had negatived the possibility of an implied promise to pay anything to her estate and, also, by the same pen, had withheld from the representatives of her estate the right which they might otherwise have had to demand payment of the instrument. It is apparent from the above that the plaintiffs do not depend upon an express promise to pay, but expect the court to find in the circumstances an implication that the defendants would pay to Mrs. Burrell's estate anything that remained unpaid upon the instrument at the time of her death. "Terms are to be implied in a contract not

because they are reasonable, but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to express them because they are too obvious to need expression." 12 Am Jur, Contracts, § 239. Any court which sought to find in the acknowledgment of indebtedness when the plaintiffs presented it to the court, the implication of which the plaintiffs seek to avail themselves, would have to shut its eyes and do violence to the provision which the decedent herself incorporated into the agreement.

We take the following from *Tanner v. Olds*, 29 Cal2d 110, 166 P2d 366:

"The law is settled that an implied condition cannot be inserted in a contract as against the express terms of the contract or to supply a condition upon which the contract is intentionally silent."

Corbin on Contracts, § 564, says:

"* * * It is more accurate, even though not very useful as a working rule, to say that where the parties have made an express contract, the court should not find a different one by 'implication' concerning the same subject matter if the evidence does not justify an inference that they intended to make one. Of course, even in the absence of any express promise or contract, an implied promise or contract should not be found to exist unless the conduct of the parties, under the existing circumstances, makes such an inference or implication reasonable. * * *

"* * * At the same time, promises should not be found by process of implication if they would be inconsistent with express provisions that there is no reason to set aside or to hold inoperative. Also, a provision should not be found by 'implication' when the testimony convincingly shows that such a provision was intentionally omitted, or that the specific matter involved was intentionally left for further negotiation and agreement."

*McPherson v. Gullett Gin Co. et al.,* 134 Miss 771, 100 So 16, says:

> "In case of a private contract of this kind where the duties and liabilities of the parties are both stipulated in the contract, there is no implied or other duty owed by either party, but all of these duties and liabilities are contained, measured, and governed by the contract."

*Gluckman v. Holzman,* 30 Del 60, 53 A2d 246, reasoned:

> "The quoted testimony indicates that the insertion of a provision fixing a definite date for the defendant to give up the practice of medicine (other than at his own pleasure) was discussed prior to the execution of the agreement. And of the utmost importance, it indicates that the defendant refused to permit the insertion of such a provision in the written agreement. In the light of this undisputed testimony introduced by both parties, should this court conclude that the parties overlooked fixing a time for retirement, with the consequence that it might imply a provision requiring performance within a reasonable time? I think not."

██ Accordingly, when the agreement of October 7 (dated October 5) was received as an exhibit and as a part of the plaintiffs' case, the court could not draw an implication that the defendants were in duty bound to pay anything to the plaintiffs as the representatives of the decedent's estate. The courts, as we have seen, will never imply a promise contrary to the intentions of the parties. Implications must facilitate and never thwart the purposes of the parties. So far as the court knew when the paper was presented, the latter was the memorandum of a single agreement and the part over Mrs. Burrell's signature was a valid, enforceable, conditional release. Those being the cir-

cumstances, the plaintiffs, upon filing this action, assumed the burden of establishing that the condition in Mrs. Burrell's handwriting was invalid and unenforceable. The sole attack made by the plaintiffs' pleading upon that provision is expressed as follows:

"Deny specifically that said provision was a part of the original agreement or any agreement whatsoever between said Mary Elizabeth Forbes Burrell and the defendants. Plaintiffs allege further that said provision was without consideration from the defendants or either of them."

We will now consider the attack made by the plaintiffs upon the validity of the conditional release. It will be recalled that the parties effected an agreement when Mrs. Burrell handed to the Cummingses $5,000. The plaintiffs claim that nothing was said on or prior to October 5 that the obligation to repay should terminate upon Mrs. Burrell's death.

Although the plaintiffs now contend that the superscription which Mrs. Burrell inscribed upon the note was nothing more than "a unilateral decision" upon her part and "not a part of any mutual agreement", that view of the matter seemingly was not entertained by them when the trial opened in the circuit court. As justification for that statement, we depend upon the opening statement which counsel for the plaintiffs made to the trial judge when he declared:

"I think the evidence will clearly establish—and I might state, Your Honor, that a deposition of the defendant was taken which is the basis of my statement of what this case will show—the only agreement between them was that if Mrs. Burrell needed this money, either principal or interest, at any time during her lifetime that they would pay it to her. I think there is no question but what she did agree that in the event of her death the

obligation would become void, and she did write across the face of it, 'Void in the event of my death', and signed her name 'Mary F. Burrell.' "

We observe that counsel for the plaintiffs, in making his above-quoted statement, termed the obligation of the defendants to repay an "agreement" and applied the word "agree" to the promise of Mrs. Burrell that "in the event of her death the obligation would become void." Counsel who then represented the estate was a seasoned, competent, experienced attorney who cannot easily be charged with a lack of understanding of the meaning of the words "agree" and "agreement".

We shall now review the evidence which reveals the inception of the transaction which culminated in the paper under scrutiny. We shall take note particularly of what was said and done on October 5. But before doing so we shall pause briefly upon the incidents which caused Mrs. Burrell and the Cummingses to become friends.

The record does not disclose the age of Cummings, but evidently he was a very young man in 1937 when he and the decedent became acquainted. According to the only testimony upon the subject, Mrs. Burrell was 65 years of age at the time of her death. She had suffered for years from a heart ailment. When the defendant met Mrs. Burrell he was employed by a real estate brokerage firm entitled Ward Cook, Inc. Mrs. Burrell and Mr. Cummings, after becoming acquainted, discovered that they had in common an interest in books, especially those of a historical nature. Mrs. Burrell possessed a sizeable number of volumes and Cummings borrowed some now and then. In turn, he performed favors for her, such as mowing her lawn and installing a drainboard in her kitchen. During

World War II Cummings served with the armed forces for three years. At the close of his service he returned to Portland and thereupon the cordial relation which he and his wife had enjoyed with Mrs. Burrell was renewed. About that time a son was born to the Cummingses and that happy event gave Mrs. Burrell an increased interest in the young couple. About once a month Mrs. Burrell made a visit to the Cummingses' home, arriving for breakfast and remaining for the day. Evidently the Cummingses in this auto age were a frugal couple, for we observe that more than three years passed after his discharge from the army before they purchased an automobile, but when they acquired one Mrs. Burrell accompanied them frequently upon rides. So far as we can ascertain from the record, she was a widow and lived alone. An item of evidence mentions a foster son but he was deceased. Mrs. Burrell, it seems reasonable to infer, found the company of the Cummingses congenial. The visits back and forth contributed to her happiness. Cummings evidently impressed her as a young man whom she wished to encourage.

Sometime before the transaction occurred which led to the execution of the acknowledgment of indebtedness Cummings became ill and was confined to his bed for six weeks. In that period Mrs. Burrell inquired more than once of Mrs. Cummings whether they needed money and expressed a willingness to make them a loan. Mrs. Cummings was fearful of notes and debts. She was not certain that her husband would survive his illness and wanted to incur no indebtedness which she might be unable to discharge. As a witness, she said: "If there was going to be any money, I was going to get my name on that paper and see that she would get her money in case she ever needed it." Not wishing

to incur an obligation which she might be unable to meet, Mrs. Cummings declined the loans.

At the conclusion of his illness Cummings returned to his employment with Ward Cook, Inc. Mrs. Burrell had known for some time that Cummings was not satisfied with his employment and that he was thinking of engaging in business for himself. She learned that an indebtedness which he owed to his employer deterred him from proceeding with his plans. Before long Mrs. Burrell volunteered to lend the Cummingses $3,000 so that Cummings could discharge his indebtedness to his employer and proceed with his purpose to engage in business for himself. After she made that offer she concluded that she ought to proffer a loan of $5,000 and did so about September 15, 1951.

Mrs. Burrell had three policies of paid-up insurance issued to her upon her life by the New York Life Insurance Company. The beneficiaries of the policies were cousins of hers, one of whom lived in Illinois and the other two in New York. She told Cummings: "They [the beneficiaries] have all the money they need, and I would rather you and Marjorie have some use out of this than that they get it." Mrs. Burrell ascertained that she could borrow from the insurance company $5,000 at six per cent upon the security of the policies, and then offered to loan that sum to the Cummingses. At that juncture some conversations took place. As they progressed Mrs. Burrell told the Cummingses that if the loan were made she would have to insist that they pay her six per cent interest so that she could pay the life insurance company the interest which it demanded. She also told the Cummingses, according to the only evidence available, that they would have to be prepared to pay her, upon demand, any part of the principal which she might need from time to time.

Such was the testimony given by Cummings when he was called to the witness stand by the plaintiffs and was under examination by the plaintiffs' attorney. We shall now quote from the testimony of Cummings given by him as a witness for the plaintiffs. All that we will quote represents Cummings' testimony upon direct examination by counsel for the plaintiffs. As will become apparent from his testimony, Cummings was recounting the conversation which he and his wife had with Mrs. Burrell prior to the time when the $5,000 was delivered.

"Q And the agreement, as I understand it, was that she was to loan you this five thousand dollars, which you obligated to repay her, together with six per cent interest, and you were to make payments to her when and as she might require it, either of principal or interest?

"A She did say this, that so far as she was concerned she never wanted the money back; she wanted it so that if anything should happen to her—in other words, I didn't have to pay it back to her unless it was something that she just had to have; that in case of her death it was void.

"Q But as long as she lived you agreed to pay her any amounts of principal and interest that she might require?

"A That is correct, and also if I may go on, also she wanted that—I mean the reason we reduced it to writing is that she wanted it as a club if I might say that; that is, more or less the words she used, as a club against my estate. If anything should happen to my wife and I she didn't want my estate to benefit by it, and that was the reason we reduced it to writing."

The above testimony was not contradicted.

In the manner above disclosed Mrs. Burrell and the Cummingses effected their arrangement whereby

she would lend them $5,000. It will be seen that the agreement was that the Cummingses would repay, upon demand, any part of the $5,000 which Mrs. Burrell might from time to time request, but the sum unpaid at the time of her death would be forgiven. Cummings expressed that phase of the transaction in this way: "In case of her death it was void." It was also agreed that the rate of interest would be the same as that which the insurance company would exact and that a memorandum of the transaction would be prepared. The conversations extended from the early part of September to October 5. As we have seen, the source of the $5,000 which Mrs. Burrell agreed to lend to the young couple was a loan which she would obtain from the security of her life insurance policies. By obtaining the money in that manner and requiring the Cummingses to maintain the interest, neither Mrs. Burrell's income nor her income-producing resources would be impaired.

October 5, 1951, Mrs. Burrell telephoned to Cummings that she had received the money from the life insurance company upon her applications for loans and requested him to call at her home for the money. That evening the Cummingses went to Mrs. Burrell's residence where she handed them $5,000. Cummings then made a memorandum of the three loans which Mrs. Burrell had received from the life insurance company, the times when interest would have to be paid upon the loans, the amount of the several required interest payments and other data of like kind. The memorandum which he made is one of the exhibits in this case. He explained that he made it so that he would know when he should make his interest payments.

The Cummingses' visit to Mrs. Burrell's home on October 5 was brief and no memorandum of her loan to them was prepared. Cummings explained the situation by saying that shortly after they arrived Mrs. Burrell's favorite radio program was being broadcast and that she was anxious to listen to it.

October 7, 1951, Mrs. Burrell came to the Cummings home for breakfast. We have seen from the testimony given by Cummings that Mrs. Burrell wanted an acknowledgment in writing of the $5,000 transaction so that "if anything should happen to my wife and I she didn't want my estate to benefit by it." According to Cummings' testimony and that of his wife, the acknowledgment of the indebtedness and Mrs. Burrell's superscription upon it were prepared and signed while the three were eating breakfast. He testified:

"Q Did you write in it 'Void in the event of my death'?

"A I did not.

"Q You wrote the rest of it, and you and your wife signed it? Is that correct?

"A That is correct.

"Q When did Mrs. Burrell write the other part on there?

"A She wrote it with my pen immediately. I handed it to her and she said, 'Now I will write right across it, "Void in the event of my death" '. She used my pen and wrote it.

\*　\*　\*　\*　\*

"Q As I understand it, you prepared the first part of the document which does not include 'Void in the event of my death'—you prepared that precisely as she instructed you to prepare it in accordance with her interpretation of your agreement?

"A Yes.

"Q And you and your wife signed it and you handed it to her without any change being made in it and turned it over to her? Is that correct?

"A However—

"Q (interrupting) Will you answer that 'Yes' or 'No' and then explain.

"A Yes.

"Q Now if you have any explanation you may make it.

"A It was understood at the time I handed it to her she was to write across the face of it 'Void in the event of my death.' "

All of the foregoing testimony was given while Cummings was a witness for the plaintiffs under direct examination by their counsel. Shortly after he had testified, plaintiffs' counsel, addressing the court, said:

"If I may make this statement, it might shorten this up. We are not contending in this case that Mrs. Burrell did not write this across the face of this note, 'Void in the event of my death'. We are not contending that she did not know what that meant. We are not contending that she was not competent or that she was subject to undue influence, although there are some circumstances that might perhaps indicate that, but in our opinion did not justify our predicating our case on those grounds. Our contention goes strictly to the validity of this act by her as being contrary to our statute, being an attempted testamentary disposition of the property and not being done in the manner the statute provided it should be done. She did it, she knew what she was doing when she did it, and she intended to do it, or intended to attempt to do it."

Cummings, rather than his wife, was the one who had discussed with Mrs. Burrell the details of the loan.

Mrs. Cummings described the preparation and signing on October 7 of the questioned document as follows:

"I think my husband handed the paper to her, and she read it over, and he asked her if it was OK, and she said 'That's fine' and she wrote and he wrote with her pen or my husband's.  *  *  *

"Q What did she say when she wrote on it?

"A She had a way of just sitting and sort of nodding if she liked something, or if she didn't like it she would be very firm about it; so I think she thought it was OK and everything was all right.

"Q After you had signed it and your husband had signed it, he handed it to her and asked her if it was all right?

"A Yes—no—we showed it to her first before we signed there.

"Q Before you signed there?

"A Yes.

"Q And she said that was all right?

"A She said 'That's fine', and he signed it and I signed it.

"Q Then you handed it back to her?

"A Yes. She was sitting right there.
*  *  *

"Q Do you know whether she wrote across the face of the note?

"A I think I remember that.

"Q What did she write across it?

"A 'Void in the event of my death—Mary F. Burrell.'

"Q And you noticed it, did you, as she wrote it?

"A She was sitting right there."

The testimony was given by Mrs. Cummings when she was called to the witness stand by the plaintiffs and was under examination by their counsel.

The evidence so far reviewed describes the manner in which (1) Mrs. Burrell, in the early part of Septem-

ber, offered the Cummingses the loan, (2) the parties agreed upon the terms of the loan, and (3) the acknowledgment of debt, dated October 5, was prepared and signed.

It will be noticed that the acknowledgment of debt rendered interest payable from October 3 whereas the $5,000 was not delivered to the Cummingses until October 5. The reason for that circumstance was the fact that the insurance company charged Mrs. Burrell interest from October 3. The phrasing of the policy loans required Mrs. Burrell to pay interest October 14 upon two of the loans, each in the sum of $2.72. So that Mrs. Burrell could make those payments, Cummings handed her a check in the amount of $5.54 October 7, which represented interest up to October 14. She cashed the check and it is one of the exhibits.

▮▮ None of the above testimony was contradicted by anyone, apart from a conflict which Cummings acknowledged in the testimony which he gave at the trial with a statement that he made in a deposition previously given. We will later take note of that conflict. As we have seen, the testimony above reviewed was given by witnesses called by the plaintiffs at a time when they were under direct examination by the plaintiffs' counsel. The plaintiffs' brief makes this statement: "When one party to an alleged contract is dead the survivor's self-serving testimony is closely scrutinized and viewed with caution." Possibly the rule stated by the plaintiffs renders its most effective service in instances in which the survivor voluntarily takes the stand as a witness in his own behalf. In such cases no one except himself vouches for his veracity. In the case at bar, the survivors, that is, the Cummingses, were called to the witness chair by the plaintiffs. Generally, a party who produces a witness vouches for his

credibility. The rule of vouchment has been modified in this state by ORS 45.590, which says:

"The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in ORS 45.610. However, when a party calls as a witness either an adverse party or * * * he shall not be deemed to have vouched for the credit of that witness and he may impeach the credit of that witness in the same manner as in the case of a witness produced by an adverse party."

Jurisdictions which have no legislation corresponding to the statute just quoted are wont to rule that when one calls as a witness his adversary, he vouches for the latter's credibility and cannot impeach him. Wigmore on Evidence, 3d ed, § 916; McCormick on Evidence, p 71; 58 Am Jur, Witnesses, § 796. The purpose of our statute was to remove the roadblock which prevented the party who called his adversary from impeaching the latter. Accordingly, if the plaintiffs were distrustful of any of the testimony given by the Cummingses, they were at liberty to deal with the latter to the full extent that impeachment and contradiction rendered possible.

The sole effort which the plaintiffs made to impair the testimony of either of the Cummingses was to show by Cummings that although, as a witness in the case at bar, he testified that the acknowledgment of indebtedness was written and signed October 7, he had stated in a pretrial deposition March 28, 1952, that the writing was prepared and signed on October 5, when Mrs. Burrell handed him the $5,000. In the case under review, Cummings admitted his error. We

will shortly take note of his explanation, but before doing so we deem it useful to spend a moment upon what he said in the deposition. In the latter he swore, as he did at the trial, that the paper was prepared and signed in his home on a Sunday morning while the three were having breakfast together. We pause to observe that October 7, 1951, was a Sunday. In his deposition he mistakenly inferred that October 5 was a Sunday. In referring to the occasion when the acknowledgment of indebtedness was prepared and signed, the following testimony was given in his deposition:

"Q What time of the day was it?
"A It was eleven o'clock in the morning.

* * *

"Q And who was present?
"A My wife and myself and Mrs. Burrell.

* * *

"Q And that was on October 5, 1951?
"A Yes.

"Q And you went to Mrs. Burrell's home?
"A I went to Mrs. Burrell's home, and I picked her up and brought here to my home, and we had breakfast together. She was fond of my hot cakes that I made, and so she had hot cakes with us, and after that we fixed up this, and she gave me the $5,000 and I gave her the memorandum.

"Q Who wrote this instrument out?
"A I wrote it.

"Q That is, the body of it that appears in the form of a note was written by you, and the signature Charles K. Cummings, is your signature?
"A That's right.

"Q And the other signature, you testified, is that of your wife?
"A That's right.

"Q  And when did Mrs. Burrell write this across the face of it?

"A  She wrote it across the face of it when I handed it to her. She used my pen, the same pen that wrote the rest of it, and she wrote that across the face."

Thus, we see that when Cummings gave the above testimony upon deposition he acquiesced in the question which plaintiffs' counsel put to him, "And that was on October 5, 1951?" by answering "Yes". But presently he seemingly sensed that he had made an error concerning the date of October 5 and interrupted the questioning of plaintiffs' counsel by declaring: "As I remember, she had already given me the money." Then the examination proceeded in this way:

"Q  Did she give it to you that morning?

"A  No, I believe she had given it to me the day before. That was on a Sunday, and I believe she had already given me the money, and I gave her the"

At that point he seemingly paused and then reverted to his former position that the money was delivered to him that morning. Upon the trial, Cummings conceded his error and testified that the money was delivered to him October 5 and that the instrument was written and signed October 7. He explained that shortly prior to the trial he was shown a diary which Mrs. Burrell had kept and in which she had recorded the fact that the money was delivered on October 5 at about the moment when her favorite radio program was about to resume after the summer recess. The notations in the diary refreshed his memory, so he swore, and made him realize that the money was delivered on Friday, October 5. Errors of the kind which this incident disclosed are of frequent occurrence and, normally, do

not discredit either the character or the memory of the individual who makes them. It will be recalled that the acknowledgment of indebtedness bore the date of October 5. It was dated back to the day when the money was delivered and, in turn, it dated back the time when interest would run to October 3, so as to conform the interest charge against the Cummingses to the day when Mrs. Burrell was charged interest by the life insurance company. Accordingly, Cummings' error was not a serious one.

The evidence of the loan and the provisions for repayment were not dependent only upon the testimony of the Cummingses and the written acknowledgment of indebtedness. The plaintiffs freely conceded that the loan was made and that Mrs. Burrell wanted any sum which remained unpaid at the time of her death to be cancelled and deemed void. Her diary, which we have mentioned, and the deposit slip which was handed to Cummings by his bank when he deposited the $5,000 are exhibits which confirm dates and other details of the transaction. A letter which Mrs. Burrell delivered to Cummings when she handed him the $5,000 manifested her deep interest in the Cummingses and in their welfare.

Omitting formal matters, the findings of fact read as follows:

"Mary F. Burrell, during her lifetime and since about 1937, was a personal friend of the defendants. She had life insurance policies with the New York Life Insurance Company of sufficient value so that $5,000.00 would be loaned upon the security of the policies. Two or three discussions occurred in which Mary F. Burrell, being desirous of helping defendant Charles K. Cummings disassociate himself as an employee of Ward Cook & Co., and to set up for himself his own real estate concern, and agree-

ment was reached whereby Mary F. Burrell would furnish to the defendant $5,000.00 borrowed from the insurance policies mentioned above.

"That on the 5th day of October, 1951, Mary Elizabeth Forbes Burrell delivered to the defendant, Charles K. Cummings, the sum of $5,000.00, which she that day received in the mail from the New York Life Insurance Company; that, at said time, as a result of prior discussions between Mary F. Burrell and Charles K. Cummings, it was agreed that said Charles K. Cummings would pay to said Mary Elizabeth Forbes Burrell interest as the same became due to the New York Life Insurance Company on said loan and defendant Charles K. Cummings further agreed that he would pay such amounts on the principal as Mary F. Burrell might demand.

"That in consideration of the obligations assumed by defendant Charles K. Cummings as set forth in paragraph 1, and the additional consideration of love, affection and gratitude felt by Mary F. Burrell for the defendants, said Mary F. Burrell decided that, in the event of her death, said obligation would cease and defendants would not be obligated to her estate in any way whatsoever.

"That, on Sunday, October 7th, 1951, Mr. and Mrs. Charles K. Cummings had a breakfast at their home with Mary F. Burrell as guest. After breakfast Mr. Charles K. Cummings, being desirous of reducing to writing the agreement heretofore reached between himself and Mary Forbes Burrell, the protection of and in conformity with the wishes of Mary Forbes Burrell, wrote as follows:

" 'October 5, 1951

For value received I owe Mary F. Burrell the sum of Five Thousand and no/100 Dollars, together with interest thereon at the rate of six per cent per annum from October 3, 1951, to the date of payment $5,000.00.'

This instrument was then signed by Charles K. Cummings and Marjorie I. Cummings, husband and

wife. It was then handed to Mary F. Burrell, and she wrote: 'Void in the event of my death' and signed her name, 'Mary F. Burrell.'

"That no part of the principal of said obligation was demanded or requested by Mary F. Burrell and none of said principal has been repaid, and no part of the interest has been paid except the sum of $5.54.

"That the agreement was not effective as a gift to become effective on the death of Mary F. Burrell because of the lack of delivery of the instrument and that the instrument is not effective as a will, not being executed with the formalities required by law.

"That it was the unquestioned intent of Mary F. Burrell that said debt be forgiven upon her death; that there was, however, no agreement or understanding between Mary Elizabeth Forbes Burrell and the defendant Charles K. Cummings at the time said loan was made, to the effect that the same should be cancelled in the event of the death of said Mary F. Burrell."

The plaintiffs have manifested no dissatisfaction whatever with any of the foregoing conclusions of the trial judge, and it seems apparent that the latter believed the two Cummingses, unless an indication of disbelief is revealed by the following words which appear in the last of the above-quoted paragraphs:

"* * * there was, however, no agreement or understanding between Mary Elizabeth Forbes Burrell and the defendant Charles K. Cummings at the time said loan was made to the effect that the same should be cancelled in the event of the death of said Mary F. Burrell."

In a memorandum opinion, the trial judge said:

"I do not find any evidence connecting Marjorie I. Cummings with the loan with sufficient definiteness to render her liable. It is true she signed the statement about owing this debt but, if that be relied

> on exclusively, the debt is forgiven by the words
> written thereon by Mary F. Burrell.''

If the debt was ''forgiven'' as to Mrs. Cummings ''by the words written thereon by Mary F. Burrell'', we cannot understand why it was not also forgiven as to Mr. Cummings. If the conditional release written upon the paper and signed by Mrs. Burrell was supported by valuable consideration in the instance of the wife, it could not have lacked consideration in the instance of her husband. The statement in the memorandum opinion about the conditional release shows that the trial court must have found that the release was supported by valuable consideration. The foregoing warrants a belief that the court found that the conditional release which Mrs. Burrell intended to be applicable to both of the Cummingses was valid as to Mrs. Cummings and released her. This state adheres to the common-law rule that the release of one of two or more joint debtors discharges all: *Reid v. Kier,* 175 Or 192, 152 P2d 417; and *Crawford v. Roberts,* 8 Or 324. In the decision last cited, this court said:

> ''* * * It is a well-settled rule of elementary law that 'a release of one joint maker by the holder * * * will discharge all the joint parties, * * *.''

The acknowledgment of indebtedness, it will be recalled, says: ''For value received I owe''. The use of the personal pronoun ''I'' created a joint and several liability: *Stacey v. Fritzler,* 160 Or 231, 84 P2d 97, 119 ALR 887; *First National Bank v. Dodd,* 118 Or 1, 245 P 503; *Noble v. Beeman-Spaulding-Woodward Co.,* 65 Or 93, 131 P 1006, 46 LRA (NS) 162. The release of one joint and several obligor releases all: 76 CJS, Release, § 49, p 678. Accordingly, if the superscription is capable of the construction which the trial court placed upon it, both of the Cummingses were released

from liability. We shall pursue that phase of the case no further. It indicates the unsoundness of the challenged judgment.

The purported finding that there was "no agreement or understanding between Mary Elizabeth Forbes Burrell and the defendant Charles K. Cummings at the time said loan was made, to the effect that the same should be cancelled in the event of the death of said Mary F. Burrell" is the "finding of fact" which the plaintiffs claim demands an affirmance of the challenged judgment. According to them, that so-called finding shows that Mrs. Burrell's action on October 7 in writing across the acknowledgment of indebtedness "Void in the event of my death" shows that her act was not supported by any consideration. We now revert to the sixth finding of fact. It states that "the agreement" was not valid as a gift "to become effective on the death of Mary F. Burrell because of the lack of delivery of the instrument", and that, likewise, it was not valid "as a will, not being executed with the formalities required by law." If those were the reasons why the court wrote into the seventh purported finding that there was "no agreement or understanding" between Mrs. Burrell and Cummings that the debt "should be cancelled in the event of the death of said Mary F. Burrell", we have one possible explanation for the conclusion expressed in the purported finding just mentioned. We agree that Mrs. Burrell's superscription constituted neither a gift causa mortis nor the making of a testamentary instrument. But the fact that the paper was not valid as a gift causa mortis, as a testamentary instrument, or as a gift inter vivos does not defeat its validity if Mrs. Burrell's superscription constituted a release conditioned upon her death.

■ Apparently the statement in the seventh paragraph that there was "no agreement or understanding * * * at the time said loan was made to the effect that the same should be cancelled in the event of the death of said Mary F. Burrell" was limited in its implications to October 5. When the money was delivered to the Cummingses, all participants in the transaction agreed that in a day or so they would prepare a written memorandum of their agreement. Mrs. Burrell, as we have seen, wished such a paper so that in the event she outlived the young couple she could file a claim against their estate. Obviously, the understanding which the parties had reached through conversations, which had extended over a period of a month or so, could be revised or modified when they prepared the written memorandum. When, following an oral agreement, a writing is prepared in the form of a contract or agreement, it supplants all of the bargainings, discussions and oral agreements which preceded it. ORS 41.740 says:

> "When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection * * *."

Therefore, if the "finding" upon which the plaintiffs depend confined itself to the day of October 5, it is concerned with a day which is irrelevant to the issue before us. The vital point is not what was said on October 5, but what was reduced to writing October 7. Since no fraud is charged against the defendants and no claim is made that the scrivener failed to write correctly the provision for a conditional release, the writ-

ing rendered immaterial all of the preliminary talk. But we will go on and in so doing will deem that the quoted language under scrutiny constitutes a finding of fact and will also momentarily disregard the parol evidence rule.

■ If the language above quoted which we have under analysis constitutes a finding of fact, then we are satisfied that it ignored, without justification, the testimony which showed that before October 5 Mrs. Burrell and the Cummingses had agreed that if the loan were made all sums remaining unpaid upon it at the time of her death should be cancelled. It also ignored their understanding that Cummings would pen the part which appears in his handwriting and Mrs. Burrell would write as a part of their agreement "Void in the event of my death". Likewise, it paid no attention to the fact that the writing was actually prepared in the manner in which the parties had agreed. Evidence concerning facts which does not discredit itself, which is not inherently improbable and which comes from witnesses who have not been discredited, contradicted or impeached, generally demands acceptance by the trier of the facts. ORS 41.260; *Inwall v. Transpacific Lumber Co.*, 165 Or 560, 108 P2d 522; Wigmore on Evidence, 3d ed, § 2495. The Cummingses were not impeached, and the slight error which Cummings made concerning a date cast no discredit upon him; rather, it indicated that his testimony had not been rehearsed. The evidence which was ignored is corroborated in large part by incidents and statements which we have sufficiently delineated. Accordingly, if the words which run "there was, however, no agreement or understanding between * * *" is a finding, it must be disregarded because it runs counter to evidence which demands acceptance.

We believe, however, that the words "there was,

however, no agreement or understanding'' for cancellation at the time of death was not a finding of fact but a conclusion of law.

▇▇▇▇▇ In the following succinct passage, 89 CJS, Findings of Fact and Conclusions of Law, § 609, we are given a rule sufficient for our purposes, pointing out the distinction between findings of fact and conclusions of law:

> ''A 'finding of fact' is a statement of the ultimate facts on which the law of the case must determine the rights of the parties, and is a finding of the propositions of fact which the evidence establishes. 'Conclusions of law' are those conclusions which the trial judge concludes flow from the ultimate facts.''

In making our statement that the purported finding is a conclusion of law and not a finding of fact, we mean that whether or not an ''agreement or understanding'' was reached by Mrs. Burrell and the Cummingses whereby the loan ''should be cancelled in the event of the death of said Mary F. Burrell'' was an issue of law for the judge who determined the final outcome of this case, and was not a question of fact for the jury, had one been employed. Findings of fact, in cases tried without a jury, are tantamount to a verdict. We have seen that it was agreed between the parties that their transaction concerning the $5,000 would be evidenced by a writing. In other words, that they would integrate the fruits of their several conversations into a memorandum.

We take the following from Wigmore on Evidence, 3d ed, § 2425:

> ''On the other hand, if instead of leaving the net effect of the negotiations to be gleaned from the mass of writings, a *single document is now*

*finally drawn* up to replace them and to embody their net effect, and is signed or otherwise adopted by the parties, this document will now alone represent the terms of the act. Instead of leaving the wheat mingled with the chaff, the wheat has been definitely selected and set apart in a single mass. The wheat existed there, no less before than now, but it has now been placed in a single receptacle by itself.

"This process of embodying the terms of a jural act in a single memorial may be termed the *Integration* of the act, *i.e.* its formation from scattered parts into an integral documentary unity. The practical consequence of this is that its scattered parts, in their former and inchoate shape, do not have any jural effect; they are replaced by a single embodiment of the act.

"In other words: *When a jural act is embodied in a single memorial, all other utterances of the parties on that topic are legally immaterial for the purpose of determining what are the terms of their act.*"

Restatement of the Law, Contracts, §§ 228 and 229, read as follows:

"An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted."

"Part of the terms of an agreement may be integrated; but an integration, unless it appears when interpreted in accordance with the rule stated in § 230 to be a statement of only part of the agreement of the parties, is an integration of the whole thereof, subject to the qualifications stated in § 240."

It is our belief that the written document prepared on October 7 and dated back to October 5 was an integration of the "agreement or understanding" of the

parties, at least so far as it pertained to cancellation upon the death of Mrs. Burrell. The issue in regard to the matter was one for the conclusions of law and not for the findings of fact.

It follows from the above that the parties wrote into their integrated agreement of October 7 a conditional release. We have seen that the plaintiffs, upon filing this action, assumed the burden of establishing that the conditional release was invalid. We do not believe that they discharged the burden; to the contrary, we are satisfied that the conditional release, as an integral part of the agreement of October 7, was supported by valuable consideration. The parol evidence rule demanded that the trial court accept the document dated October 5, but written and executed on October 7, as the sole evidence of the agreement of the parties.

The result of the foregoing is that the assignments of error under review are sustained. The judgment of the circuit court was in error. It is reversed.

LUSK, J., concurs in the result.

BRAND, J., dissents.

*Lloyd G. Hammel,* Assistant Attorney General, Salem, for objections.

*Maurice C. Corcoran,* Portland, contra.

ROSSMAN, J.

This matter is before us upon objections made by the state to a bill of costs and disbursements totaling $226.40, filed by the successful appellant.

In explanation of the objections, the Attorney General states:

"* * * The state was merely the object of a possible testamentary gift and was not a party to and had no notice or knowledge of the proceedings in the trial court; the probate court of Multnomah County granted a decree of distribution at a time when this appeal was pending resulting in the substitution of the State Board of Higher Education as the party respondent; the state has no objections to or interest in the assessing of costs against the estate of the decedent, but it is understood that the estate has been closed."

The challenged bill of costs and disbursements is composed of items of expense incurred upon appeal only.

The legislature has rendered the state subject to the taxation of costs and disbursements. ORS 20.130. In view of the fact that ORS 20.310 speaks of "the prevailing party" in providing for the taxation of costs and disbursements upon appeal, this court has held that those items are generally awarded in law actions to the prevailing party. *McKinney v. Nayberger,* 138 Or 203, 295 P 474, 2P2d 1111, 6 P2d 228. When an out and out reversal or affirmance takes place, it is not difficult to ascertain which of the parties is the prevailing one, but the problem is not always simple when a modification occurs. In dealing with a situation of that kind, *Stabler v. Melvin,* 89 Or 226, 173 P 896, reached out for and accepted the aid of Art. VII, section 3, Constitution of Oregon. It held that, upon a modification of a judgment, the award of costs and disbursements is subject to the discretion of this court. In *Levine v. Levine,* 95 Or 94, 187 P 609, the court said:

"Although this is an action at law and the appeal has resulted in a reversal, nevertheless, for

the same reason that was given in Rowe v. Rowe, 76 Or 491, 497 (149 Pac. 533), and on the authority of Stabler v. Melvin, 89 Or 226, 232 (173 Pac. 896), we do not allow the defendant a judgment for costs and disbursements; and therefore neither party shall have judgment for costs:  *  *  *."

■ *Patterson v. Horsefly Irrigation District,* 157 Or 1, 69 P2d 282, reviewed carefully the previous decisions of this court upon the problem of taxing costs in law actions where modifications or reversals occurred upon appeal. It referred, with approval, to *McKinney v. Nayberger,* 138 Or 203, 295 P 474, 2P2d 1111, 6 P2d 228, which declared that costs are purely statutory and, referring to Oregon Laws 1921, ch 322, held that the prevailing party is entitled to their allowance.

*Stabler v. Melvin,* 89 Or 226, 173 P 896, *Levine v. Levine,* 95 Or 94, 187 P 609, *Rowe v. Rowe,* 76 Or 491, 149 P 533, and *Pippold v. Cathlamet Timber Co.,* 98 Or 183, 193 P 909, which the Attorney General cites in support of his objections, and which are sometimes said to hold that the taxation of costs upon appeal in law actions is subject to the discretion of this court, were decided before the adoption of Oregon Laws 1921, ch 322. That statute is now ORS 20.310. Accordingly, when the four cases just cited were decided, no enactment of this state entitled the prevailing party, upon appeal in law actions, to an award of costs and disbursements.

■ We have no right to ignore the demands of ORS 20.310. The prevailing party—in this case the appellant—is entitled to costs and disbursements.

The objections to the bill of costs and disbursements are overruled.