Argued and submitted April 19, resubmitted In Banc November 3, 1993, affirmed
April 20, 1994

Thomas TENOLD,
*Respondent,*

*v.*

WEYERHAEUSER COMPANY,
a corporation,
and Larry Hoff,
*Appellants.*

(89-2198 CV; CA A72816)

873 P2d 413

Jeffrey M. Batchelor argued the cause for appellant Weyerhaeuser Company. Alan M. Scott argued the cause for appellant Larry Hoff. With them on the briefs were James H. Clarke and Lane, Powell, Spears, Lubersky, and Galton, Scott & Colett.

George W. Kelly argued the cause and filed the brief for respondent.

DURHAM, J. pro tempore.

Edmonds, J., concurring in part, dissenting in part.

## DURHAM, J. pro tempore

Defendants appeal a jury verdict entered against them for $2,552,566. They make multiple assignments of error. We affirm.

Plaintiff filed three claims against defendant Weyerhaeuser Company (Weyerhaeuser): malicious prosecution, intentional infliction of severe emotional distress and defamation. The jury found for plaintiff and awarded $900,000 noneconomic damages, $2,566 economic damages and $1,500,000 punitive damages against Weyerhaeuser on those claims. The jury found defendant Hoff liable on plaintiff's claims of intentional infliction of severe emotional distress and defamation and awarded $100,000 noneconomic damages and $50,000 punitive damages against Hoff.

■ In its first two assignments of error,[1] Weyerhaeuser argues that the trial court erred in denying its motions to withdraw from the jury the issue of its vicarious liability for Klamath County Sheriff Deputy Wilson's conduct. We review the evidence in the light most favorable to plaintiff to determine if there was sufficient evidence to submit the issue to the jury. *Turman v. Central Billing Bureau, Inc.*, 279 Or 443, 445, 568 P2d 1382 (1977).

Weyerhaeuser owns and operates a railroad as part of its business in Klamath County. Plaintiff worked for Weyerhaeuser for 12 years as a member of a section crew on the railroad. Defendant Hoff is a security supervisor, whose duties include investigating thefts of company property. Weyerhaeuser and the Klamath County sheriff's office entered into a contract under which Klamath County provided "Forestry Patrol and field investigation on Weyerhaeuser's property." Klamath County Sheriff Deputy Wilson carried out the county's responsibilities under the contract. Weyerhaeuser also hired Green, a private security guard, to live on its property and to provide 24-hour security.

On July 6, 1988, plaintiff asked Hoff if he could "get some railroad ties." Hoff told him it was "no problem," and instructed him to inquire of the company how much they

---

[1] Some assignments are made by Weyerhaeuser alone; some are made by both defendants.

would cost. The next day, plaintiff asked Hoff if he could use some company equipment to pick up the ties, and Hoff said "that would be fine." On July 15, 1988, Green informed Hoff that plaintiff had delivered railroad ties to a cattle ranch. Hoff reported to Walt Barnes, his immediate supervisor, and to Steve Kirk, a security supervisor, that he suspected that plaintiff had stolen the ties delivered to the ranch. Kirk then contacted Wilson and asked him to investigate. While Wilson was interviewing the owner of the ranch, he told the owner that plaintiff had stolen 600 ties and sold them to others "around the country." While being interviewed by Hoff, two of plaintiff's co-workers said that they had helped plaintiff load some ties, and that plaintiff had told them that he intended to pay for the ties. Hoff did not tell his supervisor or Wilson about the information.

Shortly after his investigation began, Wilson went to plaintiff's home and told him that "it didn't look good" and that if he would admit guilt, he would not be arrested in front of his family. Plaintiff claimed that he had permission to take the ties. On August 1, plaintiff, Hoff, Barnes and a union representative met. Plaintiff admitted taking some ties but repeatedly maintained that Hoff had given him permission. After the meeting, Barnes met with his supervisor, McClure, and told him that plaintiff "had taken ties, and that he really offered no excuses or reasons for taking the ties without paying for them." Based on that information, Weyerhaeuser terminated plaintiff's employment.

At about the same time, Wilson issued plaintiff a criminal citation for theft in the second degree, and Kirk asked the district attorney to prosecute plaintiff. Wilson's report to the district attorney did not disclose plaintiff's contention that Hoff had given him permission to take the ties with the understanding that he would pay for them at a later time. Plaintiff was indicted by the Klamath County grand jury. Subsequently, the district attorney moved to dismiss the indictment after learning that some of the ties that plaintiff had been accused of stealing did not belong to Weyerhaeuser, and that plaintiff had paid for them.

There was also evidence in the record that Hoff and other employees at Weyerhaeuser had ill will toward plaintiff. An employee testified that Hoff told him, sometime in 1986,

that "there's more than one way to get rid of [plaintiff]." Kirk testified that a Weyerhaeuser manager who was involved in the investigation said, "I don't care what the court system does or anything else, that I — I will have the man's job." Kirk also recalled in his testimony that Hoff had come to him after the charges against plaintiff were dropped and said that he had caught plaintiff in possession of marijuana a couple of years ago, that plaintiff was a drug addict, and that he wanted plaintiff "gone." Hoff's foster son testified that he overheard Hoff tell his wife that plaintiff was a drug user who had a methamphetamine lab in his house, and that he was always drunk at work. Plaintiff denied those allegations at trial.

■     Weyerhaeuser asserts that the trial court erred when it submitted the issue to the jury of whether Wilson was "its agent when he engaged in the conduct the jury ultimately found to be tortious." Weyerhaeuser's vicarious liability for Wilson's conduct depends on whether Wilson was an "employee" of Weyerhaeuser and committed the alleged tortious acts within the scope of his employment.[2] *Stanfield v. Laccoarce,* 284 Or 651, 654, 588 P2d 1271 (1978). Although the parties agree that Wilson was an employee of the county, in addition, he could be a "loaned" employee of Weyerhaeuser, if Weyerhaeuser had the right to exercise control over the manner and means by which Wilson performed his duties. *See Penrose v. Mitchell Bros.,* 246 Or 507, 512, 426 P2d 861 (1967); *Nordling v. Johnston,* 205 Or 315, 332, 283 P2d 994, 287 P2d 420 (1955); *Nichols v. Baggarley,* 79 Or App 505, 508, 719 P2d 914 (1986).

■     The contract between Klamath County and Weyerhaeuser says:

> "[Weyerhaeuser] may increase, decrease or alter work to be done and materials furnished hereunder, and any changes occasioned thereby in amounts to be paid hereunder shall be agreed to in writing prior to performance of such work or furnishing such materials. * * * All work or materials furnished hereunder shall at all times be subject to the inspection and approval of [Weyerhaeuser]."

---

[2] Defendants do not argue that Wilson was not acting within the scope of his employment when the alleged tortious conduct occurred.

That language could be construed to indicate that the parties intended that Wilson was the employee of Klamath County only and Weyerhaeuser is not liable vicariously for Wilson's conduct, as defendants argue. However, because the provision says that Weyerhaeuser has the right to "increase, decrease or alter the work to be done and the materials furnished" and the right to inspect and approve the work, it is also subject to the interpretation that Weyerhaeuser had the right to control the manner and means that Wilson used to accomplish the results sought by Weyerhaeuser. Those alternative interpretations demonstrate the ambiguity in the agreement, and the meaning of an ambiguous contract is an issue to be decided by the trier of fact. *David M. Scott Const. v. Roush*, 273 Or 877, 880, 544 P2d 162 (1975).

■ Also, what the parties intended under the contract often is discernible by their conduct in carrying out the terms of the contract. *See Tarlow v. Arntson*, 264 Or 294, 300, 505 P2d 338 (1973). Wilson testified that Kirk asked him to investigate and told him who to contact. Wilson also testified that he kept Kirk updated on the progress of his investigation and gave him a copy of his report. Kirk testified that Weyerhaeuser had "control" of the investigation and that, whenever it had a problem to investigate, the deputy was at his "disposal." There was also a handwritten statement by Wilson that said that the "reason [the criminal prosecution] was dropped was per Steve Kirk's decision." We conclude that from the entire evidentiary record, the jury could have found that Weyerhaeuser had the right of control over Wilson's conduct such as to constitute a master-servant relationship. *See Meskimen v. Larry Angell Salvage Company*, 286 Or 87, 592 P2d 1014 (1979).

■ In their third and fourth assignments of error, both defendants contend that the trial court erred in denying their motions for directed verdict on plaintiff's claims for intentional infliction of severe emotional distress. They argue that plaintiff did not present any evidence to prove that defendants' conduct was an extraordinary transgression of the bounds of socially tolerable conduct. To prove a claim for intentional infliction of severe emotional distress, plaintiff must prove that:

"(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *Sheets v. Knight,* 308 Or 220, 236, 779 P2d 1000 (1989).

It is a question of law whether, viewing the evidence in the light most favorable to plaintiff, defendants' conduct constitutes "extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior." *Hall v. The May Dept Stores,* 292 Or 131, 137, 637 P2d 126 (1981).

In *Hall v. The May Dept. Stores, supra,* the plaintiff was suspected of stealing money and was interrogated based on "scant" evidence. The court said that

"the jury could find that [the security officer] knew that he did not have 'proof' of plaintiff's guilt, that he knew he did not have evidence sufficient to have her arrested, that he nevertheless told her that he had sufficient proof to have her arrested and charged with embezzlement, and that he shouted at plaintiff and pounded the desk, referring to sheets of paper which he did not explain to her." 292 Or at 141.

From this evidence, the court held that the jury could infer that the security officer was engaging in a deliberate and systematic tactic to threaten and frighten the plaintiff into a confession and to make her an example to other employees. The court said that,

"if a jury, drawing all possible inferences favorable to plaintiff, found an intentionally oppressive method of browbeating an employee into a confession, it could also decide that this method went beyond the outer bounds of socially tolerable employer practices." 292 Or at 142.

Furthermore, in *Woods v. First American Title Ins. Co.,* 102 Or App 343, 348, 794 P2d 454 (1990), *rev den* 311 Or 151 (1991), we said that

"[f]alsely accusing someone of being a liar, a thief and a fraud before a third person, knowing that the accusations are not true, and persuading a police officer to harass the accused person on the basis of those assertions, constitute more than every-day rude behavior."

We concluded that the plaintiff's complaint stated a claim for intentional infliction of severe emotional distress.

■ Here, the crux of plaintiff's claims for intentional infliction of severe emotional distress is that employees at Weyerhaeuser intentionally and in bad faith made accusations that plaintiff had stolen the ties, despite having knowledge that he was given permission to take them and that he intended to pay for them. The jury could infer that Hoff knew that plaintiff had permission to take the ties, but that he, along with other Weyerhaeuser employees, triggered an unfounded criminal investigation to get plaintiff fired, to defame him, and to cause him to be prosecuted by the district attorney. We hold that a jury reasonably could find that defendants' conduct exceeded the bounds of socially tolerable conduct under the circumstances. Therefore, the trial court did not err in denying defendants' motion for directed verdict on plaintiff's claims for intentional infliction of severe emotional distress.

Next, Weyerhaeuser assigns as error the trial court's denial of its motion to modify the judgment to reduce the amount awarded to plaintiff for noneconomic damages to $500,000 in accordance with ORS 18.560. The jury awarded plaintiff a total of $900,000 in noneconomic damages on his three claims against Weyerhaeuser.[3] Plaintiff argues that, although ORS 18.560 limits his recovery for noneconomic damages to $500,000 per claim, he may recover more than $500,000 in noneconomic damages, because he prevailed on more than one claim. Weyerhaeuser argues that the limitation on damages in the statute means that the total award of noneconomic damages for all tort claims arising out of the same operative facts cannot be more than $500,000.

■■ In construing statutes, our task is to discern the intent of the legislature. ORS 174.010; *Mattiza v. Foster*, 311 Or 1, 4, 803 P2d 723 (1990). We first look to the text of the statute to ascertain "what is * * * contained therein, not to insert what has been omitted, or to omit what has been inserted." ORS 174.010; *Sanders v. Oregon Pacific States*

---

[3] The jury awarded plaintiff $250,000 in noneconomic damages on his claim for malicious prosecution, $500,000 for his claim for intentional infliction of severe emotional distress, and $150,000 for his claim of defamation.

*Ins. Co.*, 314 Or 521, 527, 840 P2d 87 (1992). If the meaning of the statute is not apparent on its face, we look to the statute's context, and if that is not dispositive, then we examine its legislative history. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993).

■     ORS 18.560 provides, in part:

> "Except for claims subject to ORS 30.260 to 30.300 and ORS chapter 656, in any *civil action* seeking damages arising out of bodily injury, including emotional injury or distress, death or property damage of *any one person* * * *, the amount awarded for noneconomic damages shall not exceed $500,000." (Emphasis supplied.)

The language of ORS 18.560 limits noneconomic damages to $500,000 in any "civil action." We cannot ascribe a plain meaning to the phrase "civil action," because "action" has been interpreted in a variety of ways. *See East Side Mill Co. v. SE Portland Co.*, 155 Or 367, 372, 64 P2d 625 (1937). Likewise, the statute's context is not dispositive and we find no express legislative history to indicate what the legislature meant by the phrase.[4] In the absence of such evidence, we will consider the objective of the statute to determine the legislative intent. *See State v. Parker*, 299 Or 534, 540, 704 P2d 1144 (1985).

ORS 18.560 was enacted as part of the 1987 "Tort Reform Act." Or Laws 1987, ch 774, § 6. According to the legislative history, the purpose of imposing a cap on noneconomic damages was to stabilize insurance premiums and to decrease the costs associated with tort litigation. Minutes, House Judiciary Subcommittee, April 29, 1987, pp 11, 15. In the light of that purpose, we are persuaded that the modern definition of an "action," adopted by the Supreme Court in *Dean v. Exotic Veneers, Inc.*, 271 Or 188, 193, 531 P2d 266 (1975), best fulfills the objective of the statute:

---

[4] A preliminary version of ORS 18.560 said that "the amount awarded for noneconomic damages shall not exceed $500,000 per person in the aggregate." During its first work session, the legislature deleted the phrase "per person in the aggregate," because it found the language to be confusing. Chairman Frye said that the committee's intention was to limit damages to $500,000 per person and that the language that limits damages of any one person sufficiently reflected that intention. There was no discussion of multiple claims. Tape Recording, Senate Committee on Judiciary, March 23, 1987, Side A at 355-416.

"The most convenient [definition] is to consider a cause of action as an *aggregate of operative facts* giving rise to a right or rights termed 'right' or 'rights of action' which will be enforced by the courts. The number and extent of operative facts included within a single cause of action are to be determined pragmatically, mainly by considerations of practical trial convenience." (Emphasis supplied.)

The relevant factors for determining what connotes an "aggregate of operative facts" are "their relatedness in time, space, origin, or motivation, and whether, taken together they form a convenient unit for trial purposes." *Troutman v. Erlandson*, 287 Or 187, 206, 598 P2d 1211 (1979). In this case, plaintiff's factual allegations about Weyerhaeuser's course of conduct are an aggregate of operative facts that give rise to several "rights of action." We conclude that the statute directs the trial court to reduce the noneconomic damage award to $500,000.

■   However, plaintiff contends that ORS 18.560 violates Article VII (amended), section 3, of the Oregon Constitution, which provides, in part:

"In actions at law, where the value in controversy shall exceed $200, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

"Reexamine" means to subject to "a second or new examination." *Websters Third New International Dictionary* 1907 (unabridged 1976). We cannot discern from the text and context of Article VII (amended), section 3, whether a court "re-examines" a "fact tried by a jury" when it reduces a damage award that exceeds the statutory limit. *See Comeaux v. Water Wonderland Improvement Dist.*, 315 Or 562, 570, 847 P2d 841 (1993). To resolve that question, we look for guidance to the circumstances surrounding the adoption of Article VII (amended), section 3. *See PGE v. Bureau of Labor and Industries, supra*, 317 Or at 611.

*Van Lom v. Schneiderman*, 187 Or 89, 98, 210 P2d 461 (1949), discusses the evolution of Article VII (amended), section 3. The framers of the United States Constitution preserved the right of trial by jury, as it was know at common law, in the Seventh Amendment, which provides:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

That amendment protected the jury trial right as it had developed in England. At the time of the adoption of the Seventh Amendment, English common law reserved to the jury the determination of the amount of damages. 3 W. Blackstone, Commentaries 396. However, the English system authorized the court, in a damage action, to grant a new trial if the judge believed that the verdict awarded excessive damages. *Van Lom* says that

"the federal judges, like the English judges, have always exercised the prerogative of granting a new trial when the verdict was clearly against the weight of the evidence, whether it be because excessive damages were awarded or for any other reason." 187 Or at 112.

Oregon preserved that federal jury trial right when it adopted Article I, section 17, as part of its Bill of Rights.[5] That section provides:

"In all civil cases, the right of Trial by Jury shall remain inviolate."

Before 1910, Oregon also retained the tradition of allowing courts to set aside "excessive" verdicts. *Van Lom v. Schneiderman, supra,* 187 Or at 105. For example, OCLA, § 5-802, authorized a new trial for:

"(5) Excessive damages, appearing to have been given under the influence of passion or prejudice; (6) Insufficiency of the evidence to justify the verdict or other decision[.]"

*See* 187 Or at 105.

In 1910, the people of Oregon adopted Article VII (amended), section 3. The amendment repeats the substance of Article I, section 17, but also creates a limitation on the

---

[5] *Deane v. Willamette Bridge Co.,* 22 Or 167, 29 P 440 (1892), on which the dissent relies, 127 Or App at 532-33, held that the plaintiff had no constitutional right under Article I, section 17, of the Oregon Constitution, to a jury determination of damages in a default proceeding, because the English common law did not afford a jury trial right in a default proceeding. *Deane* is of limited utility here, because it was decided 18 years before the adoption of Article VII (amended), section 3, and this case does not concern rules applicable to default proceedings.

authority of an Oregon court to reexamine a jury's deter-
mination of any fact, through the proscription: "no fact tried
by a jury shall be otherwise re-examined in any court of this
State." *Buchanan v. Lewis A. Hicks Co.*, 66 Or 503, 510, 133
P 780, 134 P 1191 (1913), describes the problem that the
amendment was intended to correct:

> "Pursuant to the provisions of that statute [Lord's Oregon
> Laws, § 174] it had been the practice of many trial courts in
> Oregon, prior to the amendment of the organic law * * * to
> set aside judgments and grant new trials, when, from a
> consideration of all the evidence given at the trial of an
> action, it was believed the verdict was excessive. In order to
> inhibit such practice and to uphold verdicts, the Constitution
> was amended so as to preclude a court from re-examining any
> fact that had been tried by a jury, when the verdict returned
> was based on any legal evidence * * *."

In *Van Lom v. Schneiderman, supra*, 187 Or at 95, the court
said:

> "This last clause forbids re-examination of a fact found by a
> jury otherwise than by another jury * * *, and is transgressed
> every time that a court undertakes to revise or correct a
> jury's finding of fact (unless this be done by the Supreme
> Court where there is error in the record * * *). All that the
> court may do, so far as the facts are concerned, is to examine
> the record to determine whether it 'can affirmatively say
> there is no evidence to support the verdict.' "

The Supreme Court has held that the amendment was
intended to prohibit courts from deciding that a jury's factual
determination of the amount of damages is improper when
measured against a statutory standard, such as "excessive,"
and nullifying the verdict.

> "The purpose of this amendment [to Article VII, section
> 3] was to prohibit courts from setting aside or modifying
> judgments founded upon verdicts of juries, where there is no
> prejudicial error in the record. In this case the jury was
> properly instructed, and there is no assignment of error
> except as to the amount of the verdict. Under such circum-
> stances, it was for the jury only to fix the amount of plaintiff's
> damages, which it did by a unanimous verdict.
>
> "* * * * *
>
> "Although in the opinion of this court the amount of damages
> awarded might be deemed excessive, we cannot affirmatively

say that there is no evidence to support it. Under the record in the case, this court is powerless to grant relief." *Malpica v. Cannery Supply Co.*, 95 Or 242, 247, 187 P 596 (1920).

*Malpica v. Cannery Supply Co., supra,* is but one of many cases that hold that Article VII (amended), section 3, is a limitation on the court's power to set aside or modify a jury's factual determination of damages, or a judgment that embodies that determination, following a fair trial. In *Sigel v. Portland Ry. L. & P. Co.*, 67 Or 285, 291, 135 P 866 (1913), the court held that, after the plaintiff presented the evidence of her injury,

"[i]t therefore became the duty of the jury to determine the amount of her damages. * * * The judgment on the verdict could not be set aside without the re-examination of a question of fact which had been tried by a jury upon legal evidence and under proper instructions as to the law."[6]

*Roach v. Mead*, 301 Or 383, 385, 722 P2d 1229 (1986), states:

"In *Shepler v. Weyerhaeuser Company*, 279 Or 477, 484, 569 P2d 1040 (1977), which concerned a jury verdict for plaintiff in a negligence action, we defined our scope of review in civil actions at law:

" '* * * Since the verdict was for plaintiff, we could not find error * * * unless we could affirmatively say there is no evidence to support the verdict. (Oregon Constitution, Amended Art. VII, § 3.)' "

The Supreme Court has applied that limitation on appellate review authority since the earliest cases construing Article VII (amended), section 3.

"[T]he Supreme Court, on appeal, is powerless to re-examine any fact tried by a jury, unless it, like the lower court, in passing upon a motion for a new trial, can affirmatively say there is no evidence to support the verdict. * * *

---

[6] The determination of the amount of punitive damages is likewise a question of fact. *Van Lom v. Schneiderman, supra*, 187 Or at 111, discussing punitive damages, says:

"Under a system such as ours, where the court responds to the law and the jury to the facts, it would be difficult indeed to say that a question which for centuries has been submitted to the decision of a jury is other than a question of fact. And the reluctance of the courts, having power to do so, to interfere with the jury's decision, gives added weight to this conclusion."

*See also Hahn v. Mackey*, 63 Or 100, 111, 126 P 12, 126 P 991 (1912).

"[T]he right, upon appeal, to correct a judgment rests upon an error of law committed by the trial court and not upon the re-examination of any fact tried by a jury, except in cases where the Supreme Court can affirmatively say there is no evidence to support the verdict." *Buchanan v. Lewis A. Hicks Co., supra,* 66 Or at 511.

*Sullivan v. Wakefield,* 65 Or 528, 535, 133 P 641 (1913), says:

"Under this section of the Constitution, a court cannot legally set aside the findings of the jury, where there has been no error of law, without affirmatively finding that there was *no* evidence to support the verdict." (Emphasis in original.)

In *Love v. Chambers Lumber Co.,* 64 Or 129, 133, 129 P 492 (1913), the court said:

"Where there is evidence to support a verdict, and the facts have been submitted to a jury under proper instructions, we are precluded from disturbing such verdict. Article VII, Section 3, of the constitution as amended November 8, 1910 * * *."

Similarly, the court said in *State v. Hill,* 63 Or 451, 459, 128 P 444 (1912):

"Under the recent amendment to our constitution (Article VII, section 3), if there is any evidence to support the verdict, this court cannot disturb it. The jury are the exclusive judges of all questions of fact."

ORS 18.560 reinstitutes the practice of courts reducing excessive jury awards, except that it substitutes a statutory monetary standard, $500,000, for statutory criteria controlling judicial discretion (*e.g.,* "excessive damages," "passion or prejudice," and "insufficiency of the evidence"). It requires the court to apply the monetary standard in every case, whether or not the evidence supports the jury's higher damage award. Article VII (amended), section 3, was designed to prevent that practice, because the people chose to make jurors the exclusive judges of the facts regarding the extent of a plaintiff's damages. We have examined the context of the adoption of Article VII (amended), section 3, and the problem that it sought to remedy. From our examination, we conclude that a jury's verdict on damages, which is supported by the evidence, is a "fact tried by a jury" under that amendment, and that ORS 18.560 violates that amendment, because it

compels the court to reexamine the verdict by requiring the court to nullify the jury's factual determination to the extent that it exceeds the legislature's damage cap.

Weyerhaeuser argues that its motion did not threaten any interference with the jury's factual determination on damages because ORS 18.560 operates as a limitation after the jury makes its award.[7] We give the same response to that argument as the Washington Supreme Court gave to it in *Sofie v. Fibreboard Corp.*, 112 Wash 2d 636, 655, 771 P2d 711, 780 P2d 260 (1989):[8]

> "Respondents also contend that the damages limit affects only the judgment as entered by the court, not the jury's finding of fact. This argument ignores the constitutional magnitude of the jury's fact-finding province, including its role to determine damages. Respondents essentially are saying that the right to trial by jury is not invaded if the jury is allowed to determine facts which go unheeded when the court issues its judgment. Such an argument pays lip service to the form of the jury but robs the institution of its function. This court will not construe constitutional rights in such a manner. As we once stated:
>
>> " 'The constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name * * *. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding. *State v. Strasburg*, 60 Wash. 106, 116, 110 P. 1020 (1910), quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325, 18 L. Ed. 356 (1866).' "

---

[7] The dissent relies on *Wiebe v. Seeley, Administrator*, 215 Or 331, 335 P2d 379 (1959), which interpreted a statutory limitation on wrongful death damages, for the proposition that, after the adoption of Article VII (amended), section 3, in 1910, "the legislature's authority to limit the amount of reasonable damages remained unfettered." 127 Or App at 534. *Wiebe* does not support that argument, because no party in *Wiebe* challenged the wrongful death statute under Article VII (amended), section 3. The court noted, "It is not suggested that such a statute is beyond the powers of the legislature." 215 Or at 353. *Wiebe* construes a statute, not a constitutional provision.

[8] *Sofie* held that a statutory limit on the noneconomic damages recoverable by a personal injury or wrongful death plaintiff infringed on the Washington state constitutional guarantee of the right to trial by jury. The court's opinion reports that that view reflects the weight of authority from other jurisdictions, particularly those states that have analyzed the history of the jury trial right. 112 Wash 2d at 659. On that point, Oregon's constitutional history is similar to that of Washington, except that Oregon, by enacting Article VII (amended), section 3, has expressed its constitutional policy on protecting jury verdicts from judicial reexamination more clearly than any other state.

Weyerhaeuser also contends that, if the statute compels a reexamination of a fact found by the jury, courts are similarly barred from applying the statutes that govern contributory negligence, ORS 18.470,[9] and contribution, ORS 18.455.[10] Those statutes are not analogous because, under them, the court gives effect to the jury's findings on damages. Under ORS 18.470, the court carries out the jury's findings on the amount of the plaintiff's damages and the plaintiff's proportionate fault. Under ORS 18.455, the court reduces the damage award by the amount that the plaintiff has already recovered from a co-defendant to ensure that the plaintiff receives only the amount of damages found by the jury. In contrast, ORS 18.560 directs the court to nullify the jury's verdict on damages to the extent that the verdict exceeds the amount that the legislature has determined is a fair award in all cases, regardless of the jury's contrary determination from the evidence in a particular case.

Weyerhaeuser's motion invited the trial court to set aside the jury's verdict, because it was too large when measured by the damage cap in ORS 18.560. Article VII (amended), section 3, forbids the court to reexamine the verdict unless no evidence supports it. Because evidence in

---

[9] ORS 18.470 provides:

"Contributory negligence shall not bar recovery in an action by any person or the legal representative of the person to recover damages for death or injury to person or property if the fault attributable to the person seeking recovery was not greater than the combined fault of the person or persons against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the percentage of fault attributable to the person recovering. This section is not intended to create or abolish any defense."

[10] ORS 18.455 provides:

"(1) When a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death or claimed to be liable in tort for the same injury or the same wrongful death:

"(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

"(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

"(2) When a covenant described in subsection (1) of this section is given, the claimant shall give notice of all of the terms of the covenant to all persons against whom the claimant makes claims."

the record supported the verdict, the court correctly refused to set it aside.[11]

■ Defendants' remaining assignments of error challenge the jury's punitive damages award. They assert that the award was excessive and, therefore, violated their rights under Article I, section 16, of the Oregon Constitution, the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[12] They assign as error the denial of their motion for a new trial on that basis. ORCP 64B. In *Oberg v. Honda Motor Co.*, 316 Or 263, 275, 851 P2d 1084 (1993), *cert granted* ___ US ___, 114 S Ct 751, 127 L Ed 2d 69 (1994), the Supreme Court held that Article I, section 16, applies only to criminal cases, and that the award in that case did not violate the Due Process Clause under the holding in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 US 1, 111 S Ct 1032, 113 L Ed 2d 1 (1991).[13] Similarly, Article I, section 16, does not apply in this case and the punitive damages award does not violate defendants' due process rights in the light of the court's instruction that outlined objective criteria on which the jury was required to base its decision,[14] and because of the availability of post-verdict review.

---

[11] In *Rogers v. Hill*, 281 Or 491, 506, 576 P2d 328 (1978), Justice Tongue, joined by Justice Lent, in a special concurring opinion, said:

"[A]lthough juries may sometimes make mistakes, so do judges, and the voters and legislature of Oregon, by the constitutional and statutory provisions adopted by them, made a deliberate choice to confer upon juries the exclusive and final authority *to* resolve such questions and *to* remove from the courts the power to either set aside such determinations by juries *or to withhold such questions from juries for determination.*" (Emphasis supplied.)

We do not address whether Article VII (amended), section 3, forbids courts from withholding traditional factual issues, such as the amount of a plaintiff's damages in a tort action, from a jury and, if so, whether ORS 18.560 violates that obligation.

We also do not address other arguments concerning the constitutionality of ORS 18.560. For example, we do not address whether ORS 18.560 violates the duty of courts to administer justice "completely," within the meaning of Article I, section 10, because it compels the court to reduce a jury's damage award that the evidence supports.

[12] Plaintiff argues that defendants did not preserve their argument that the punitive damages award violated the prohibition against excessive fines under both the federal and the state constitutions. We disagree.

[13] *See also TXO Production Corp. v. Alliance Resources Corp.*, ___ US ___, 113 S Ct 2711, 125 L Ed 2d 366 (1993).

[14] The jury was instructed:

"If you have found that Plaintiff is entitled to general damages, you must then consider whether to award punitive damages. Punitive damages may be

■　　　Regarding the Eighth Amendment, the United States Supreme Court held in *Browning-Ferris v. Kelco Disposal*, 492 US 257, 264, 109 S Ct 2909, 106 L Ed 2d 219 (1989), that the clause does not apply to awards of punitive damages in cases between private parties "when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded." The Court left open the question we must answer in this case: whether the amendment applies to a civil action when the government has a right to share in the award. In reviewing the purpose and the history of the Eighth Amendment, it said that the framers were concerned with "the potential for governmental abuse of its 'prosecutorial' power" and that the Excessive Fines Clause was "intended to limit only those fines *directly imposed by*, and payable to, the government." 492 US at 266, 268. (Emphasis supplied.) Furthermore, it said that it

> "has never held, or even intimated, that the Eighth Amendment serves as a check on the power of a jury to award damages in a civil case. Rather, our concerns in applying the Eighth Amendment have been with the criminal process and with *direct actions initiated by government* to inflict punishment. Awards of punitive damages do not implicate these concerns." 492 US at 259. (Emphasis supplied.)

Under ORS 18.540,[15] the government becomes a beneficiary of a portion of a punitive damages award after a

---

awarded to the Plaintiff, in addition to general damages, to punish the wrongdoer and to discourage the Defendant and others from engaging in wanton misconduct. In considering punitive damages, you must first determine whether the Defendant was guilty of wanton misconduct that caused damage to Plaintiff. Wanton misconduct is conduct amounting to a particularly aggravated deliberate disregard of the rights of others. If you decide this issue against the Defendant, you may award punitive damages, although you are not required to do so, because punitive damages are discretionary. In the exercise of the discretion[,] you may consider the *importance to society of deterring similar misconduct* in the future. If you decide to award punitive damages, you may properly consider the following items in fixing the amount. First, the *character of the Defendant's conduct*. Second, the Defendant's *motive*. Third, the *sum of money that would be required to discourage* the Defendant and others from engaging in such conduct in the future. And fourth, the *income and assets* of the Defendant. The amount of punitive damages may not exceed the sum of $2,000,000 — $1,000,000 on the malicious prosecution, and $1,000,000 on the intentional infliction of emotional distress." (Emphasis supplied.)

[15] ORS 18.540 provides, in part:

"Upon the entry of a judgment including an award of punitive damages, the Department of Justice shall become a judgment creditor as to the punitive

verdict has been entered. In this case, a private party brought an action against defendants, and the jury directly imposed the judgment against defendants to punish and to deter future misconduct. The government of Oregon did not initiate this action. Because the purpose of the Eighth Amendment would not be furthered if applied under the circumstances, we reject defendants' arguments. The trial court did not err in denying their motion for a new trial.

Affirmed.

**EDMONDS J.**, concurring in part; dissenting in part.

I concur in the majority's opinion, except for the portion that holds that the limitation on noneconomic damages in ORS 18.560 is unconstitutional. The majority says that ORS 18.560 violates the prohibition in Article VII (amended), section 3, against the reexamination of a fact "tried by a jury," and thus, it invalidates the major component of the Oregon Tort Reform Law enacted in 1987. It rejects Weyerhaeuser's argument that the statute does not interfere with the jury's factual determination because the statute operates as a legal limitation after the jury makes its award on the basis of the reasoning of the court in *Sofie v. Fibreboard Corp.*, 112 Wash 2d 636, 771 P2d 711, 780 P2d 260 (1989). For the reasons that follow, the majority's reliance on that reasoning is ill-placed, and it errs when it declares the statute to be unconstitutional under section 3.

*Sofie v. Fibreboard, supra*, is about Article I, section 21, of the Washington Constitution, which provides that "the right of trial by jury shall remain inviolate."[1] Of course,

---

damages portion of the award to which the Criminal Injuries Compensation Account is entitled pursuant to paragraph (c) of this subsection * * *."

[1] The language "the right to trial by jury shall remain inviolate," is found also in the Bill of Rights, Article I, section 17, as originally adopted in the Oregon Constitution. In Oregon, the provision has been interpreted to mean the "right [to have] a jury determine *all issues of fact.*" *Molodyh v. Truck Insurance Exchange*, 304 Or 290, 297, 744 P2d 992 (1987). (Emphasis supplied.) There are differing interpretations of whether a statutory limitation on the amount of damages violates the "inviolate" right to trial by jury, depending on the jurisdiction. For instance, Article I, section 20 of the Indiana Constitution contains a provision identical to Article I, section 17, and Article I, section 21, of the Oregon Constitution. In *Johnson v. St. Vincent Hospital Inc.*, 273 Ind 374, 404 NE2d 585 (1980), the appellants argued that an Indiana statute which limited damages in medical malpractice cases violated section 20. The court disagreed.

Article VII (amended), section 3, has entirely different language. The *Sofie* court examined the right to trial by jury as it existed in Washington at the time of section 21's adoption in 1889. The court was persuaded by the decision in *Baker v. Prewitt*, 3 Wash Terr 595, 19 P 149 (1888):

> *"Baker's* holding provides clear evidence that the jury's fact-finding function included the determination of damages. This evidence can only lead to the conclusion that our constitution, in article 1, section 21, protects the jury's role to determine damages." *Sofie v. Fibreboard Corp., supra,* 112 Wash 2d at 646.

This court's adoption of the *Sofie* court's reasoning without regard to the discrete language and history of section 3 constitutes a "nonanalysis" of the issue. Moreover, as will be demonstrated later, the Washington court's construction of section 21 is inconsistent with our Supreme Court's construction of Article I, section 17, of the Oregon Constitution, although the language of the provisions is identical. Finally, the *Sofie* court's reasoning is flawed because it fails to recognize the difference between the jury's fact finding process and the imposition of a rule of law by a trial court subsequent to the jury's factual determination.

A proper analysis begins with the understanding that ORS 18.560 is presumptively constitutional, and that we cannot declare a law that the legislature has passed in the best interests of all of the citizens of Oregon unconstitutional except when the unconstitutionality is clearly shown. *See Bowden v. Davis et al,* 205 Or 421, 289 P2d 1100 (1955). The first step of the analysis is to examine the language of section

---

"When a request is made to the trial court for an order to determine the amount due claimant from the patient's compensation fund after a trial by jury on the issue of damages has taken place and the trial court has rendered a judgment, no contest with regard to the total damages due claimant can or does exist. That issue has already been finally adjudicated by the trier of fact. * * * Furthermore, there is no indication in the cases relied upon by appellants that the right to have a jury assess the damages in a case properly tried by jury constitutes a limitation upon the authority of the Legislature to set limits upon damages. * * * It is the policy of this Act that recoveries be limited to $500,000, and to this extent the right to have the jury assess the damages is available. No more is required by Art. I, § 20 of the Indiana Constitution in this context." 404 NE2d at 602.

In my assessment, the Indiana Supreme Court's opinion has no more relevance to the Oregon Constitution than the Washington Supreme Court's opinion.

3. It is presumed that the language used in section 3 is sufficiently precise to convey the intent of its framers.

"To find the thought a given [constitutional provision] expresses, the first resort in all cases is to the natural signification of the words used * * *. If thus regarded the words embody a definite meaning, * * * there is no room for construction." *Monaghan v. School District No. 1, Clackamas County*, 211 Or 360, 367, 315 P2d 797 (1957).

The majority says that " 'reexamine' means to subject to a 'second or new examination,' " but that it cannot discern "whether a court 're-examines' a 'fact tried by a jury' when it reduces a damage award that exceeds the statutory limit." 127 Or App at 520. I disagree, because the meaning of section 3 is plain from the language of the provision. "Facts are actualities." *See Churchill v. Meade*, 92 Or 626, 636, 182 P 368 (1919). A determination of an ultimate fact is a determination of what took place based on the underlying evidentiary facts and the inferences drawn therefrom. *See Maeder Steel Products Co. v. Zanello*, 109 Or 562, 570, 220 P 155 (1924). In contrast, the imposition of a rule of law by a court arises from a different source; from the mandate of a constitutional provision, a statute or the case law. Although a ruling of law by the court often "flows from the ultimate facts" as found by the trier of fact, it is uniquely within the province of the court and it does not involve the fact finding process. *State v. Cummings*, 205 Or 500, 532, 288 P2d 1036 (1955); *see also Can-Key v. Industrial Leasing*, 286 Or 173, 183, 593 P2d 1125 (1979).

Section 3 recognizes that difference. It prohibits the "reexamination of facts" tried by a jury but at the same time preserves the power of the court to set aside a verdict if there is no evidence to support it. That language demonstrates that the framers were cognizant of the difference between the fact finding process and the imposition of a rule of law dictated by the facts of a case. Section 3 does not prohibit the imposition of a rule of law that supersedes a determination of fact by a jury.

The next step is to determine whether the application of ORS 18.560 to a jury verdict constitutes "a reexamination of fact" or the imposition of a "rule of law." It is clear

that the determination by a jury about the amount of damages that a plaintiff has incurred as a result of a defendant's conduct is a determination of ultimate fact and implicates section 3. *See Chance v. Alexander*, 255 Or 136, 138, 465 P2d 226 (1970). For instance, if a jury determines that the plaintiff has incurred $600,000 in noneconomic damages, no court in Oregon could lawfully reexamine the evidence and substitute its finding that the plaintiff had incurred only $450,000 in damages for the jury's determination.

However, ORS 18.560 does not require the trial court to make a reassessment of the amount of damages, but requires the court to perform a different function. It says, "the amount awarded for noneconomic damages shall not exceed $500,000," and requires the trial court to enter judgment for not more than that amount. No reevaluation of the amount of damages incurred by the plaintiff occurs. The statute establishes a fixed ceiling on the amount of damages for which a judgment could be entered. The effect of the statute is to impose a rule of law, a limit on "recoverable" damages on the jury's verdict. In that sense, the statute, in concept, is no different than other rules of law which require a trial court to enter a judgment that changes the decision of the jury, *e.g.*, a directed verdict under ORCP 60, a judgment notwithstanding the verdict under ORCP 63, a reduction in an award of damages because of comparative negligence under ORS 18.470, or a judgment for treble damages for timber trespass under ORS 105.810. When the language of section 3 and ORS 18.560 are compared, logic tells us that the implementation of the statute does not involve the substitution of the court's determination of the amount of damages for that of the jury's.

Even if, because of an ambiguity in section 3, we were permitted to look further for the answer to the query, the majority's analysis is not helpful. None of the cases that it cites are about statutes that impose legal limitations on the amount of damages that are recoverable in a particular claim. All of them concern the setting aside of excessive verdicts on the basis that the trial judge did not agree with the jury's determination of the facts. We must keep in mind that section 3 is to be interpreted to give effect to the intent of the people adopting it in 1910. The majority is not permitted to rewrite

the constitution to outlaw ORS 18.560 unless the statute conflicts with what the people had in mind at that time. *Jones v. Hoss*, 132 Or 175, 178, 285 P 205 (1930). With those principles in mind, I examine the background underlying the adoption of section 3 and its historical relationship to Article I, section 17.

Inherent in the majority's holding is the belief that plaintiffs had a historical right to unlimited damages for personal injury at common law and that the legislature cannot constitutionally limit the amount of damages that could be awarded in a personal injury action. That belief is mistaken. At common law, the courts could control excessive verdicts. They could order a new trial "when the verdict was clearly against the weight of the evidence, whether it be because excessive damages were awarded or for any other reason." *Van Lom v. Schneiderman*, 187 Or 89, 112, 210 P2d 461 (1949). When the constitution was adopted, the founding fathers did not intend to create an enhanced right to trial by jury, but instead intended that the practice of the courts at the time continue. *See Tribou v. Strowbridge*, 7 Or 156, 158 (1879).

If courts could control the award of damages under section 17, the legislature could also. For instance, in 1862, the legislature authorized courts to set aside verdicts and grant new trials because of "[e]xcessive damages * * * given under the influence of passion or prejudice." *See* General Laws of Oregon, ch 2, § 232(5), p 197 (Civ Code) (Deady 1845-1864). More importantly, also in 1862, the legislature enacted a statute which limited the amount of recoverable damages in a wrongful death action:

> "When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action at law therefor against the latter, if the former might have maintained an action, had he lived, against the latter, for an injury caused by the same act or omission. Such action shall be commenced within two years after the death, and the damages therein shall not exceed five thousand dollars, and the amount recovered, if any, shall be administered as other personal property of the deceased person." General Laws of Oregon, ch 4, § 367, p 941 (Civ Code) (Deady 1845-1864).

There is more evidence that bears on the state of the law before section 3 was adopted. In *Deane v. Willamette Bridge Co.*, 22 Or 167, 29 P 440 (1892), the Supreme Court recognized the constitutional authority of the legislature to govern the procedure of awarding damages when it upheld the constitutionality of a statute that required the court without the intervention of a jury to assess damages when the defendant was in default. The court noted the common law power of courts to decide questions of law and distinguished those matters from questions of fact to be decided by a jury under section 17. 22 Or at 173. It then held that the assessment of damages by a jury at common law when the defendant was in default was not a matter of right, but could be decided by the court alone. Thus, the statue was held constitutional in the face of a challenge under section 17.

Presumably, the drafters of section 3 were aware of existing statutes and precedents when section 3 was enacted in 1910. It is uncontroverted that the "mischief" at which the constitutional provision was aimed was the multiplicity of new trials that were being granted by trial courts on the basis of excessive damages. *Van Lom v. Schneiderman, supra,* 187 Or at 100. To remedy that problem, section 3 provides that a new trial cannot be ordered unless it can be said affirmatively that there is no evidence to support the verdict or that there was legal error committed during the initial trial. However, the authority of a trial court to grant a nonsuit or directed verdict on a point of law clearly remains unimpaired by the amendment. Lusk, "Forty Five Years of Article VII, section 3, Constitution of Oregon," 35 Or L Rev 1, 4 (1955).

In 1907, the legislature passed a law which amended the limitations on wrongful death damages and increased it to $7,500. *See* Lord's Oregon Laws § 380. There is no evidence that I can find that suggests that the drafters of section 3 intended to nullify that law and it continued in various forms until 1967. Or Laws 1967, ch 544, § 2. *See also Wiebe v. Seely, Administrator,* 215 Or 331, 351, 335 P2d 379 (1959).[2] Consequently, the authority of trial courts to set aside verdicts after

---

[2] In *Wiebe v. Seely, Administrator, supra,* what the court said about the nature of a statutory limitation on damages is instructive:

"*[T]he statute does not deal with the function of the jury at all, but with that of the court.* The legislature has said, in effect, that regardless of the extent of the damages actually suffered by the plaintiff in an action against the estate of a

1910 for excessive damages was limited, but the legislature's authority to limit the amount of reasonable damages remained unfettered. Under the circumstances, the majority cannot reasonably hold that the drafters intended by section 3 to abrogate the authority of the legislature to enact a statute like ORS 18.560.

In summary, the majority forgets about the import of the presumption that ORS 18.560 is constitutional, relies on a decision by the Washington Supreme Court about an unrelated provision of the Washington Constitution as the basis of its rationale, says that it cannot "discern" what "reexamination" of a fact means in the context of the plain language of section 3, and ignores the historical evidence about the objective of the framers of section 3. A philosophical difference with the legislature about the wisdom of the tort reform law is not a sufficient justification for declaring a statute unconstitutional. It is only when a statute violates the constitution expressly or implicitly that it is unconstitutional. ORS 18.560 does neither.

Because my analysis would result in holding that ORS 18.560 does not violate Article I, section 17, or Article VII (amended), section 3, I address plaintiff's alternative argument that the statute violates Article I, section 10, of the Oregon Constitution. Section 10 provides:

> "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Plaintiff argues that "the statute prevents a plaintiff with noneconomic damages in excess of $500,000 from receiving the 'remedy [* * *] for injury done him' which the constitution contemplates."

At common law, litigants had the right to recover damages for injury to their person or property and to have a jury assess those damages when the facts were in dispute. *Deane v. Willamette Bridge Co., supra,* 22 Or at 173. However, the right did not prevent the legislature from changing

---

deceased tort-feasor, *recoverable* damages may not exceed $15,000. * * * It is not suggested that such a statute is beyond the powers of the legislature." 215 Or at 352. (Emphasis supplied.)

common law remedies, or "attach[ing] conditions precedent to [their] exercise, and perhaps abolish[ing] old and substitut-[ing] new remedies." *Mattson v. Astoria*, 39 Or 577, 580, 65 P 1066 (1901).[3] Article XVIII, section 7, provides:

> "All laws in force in the territory of Oregon when this constitution takes effect, and consistent therewith, shall continue in force *until altered or repealed*." (Emphasis supplied.)

Based on section 7, the Supreme Court in *Perozzi v. Ganiere*, 149 Or 330, 40 P2d 1009 (1935), rejected the plaintiff's contention that the legislature could not abolish or limit an automobile guest's remedy for negligent injury in an action brought against his host. The court said:

> "The right to alter all laws in force in the territory of Oregon when the constitution was adopted, whether the same were of common-law or legislative origin, was reserved to the people of the state by article XVIII, § 7, supra. Indeed, that section of our organic act which adopted the common law of England clearly contemplated future changes in the common law, as evidenced in the condition expressed that the common law should continue in force *'until altered or repealed'*. Moreover, had it been the intention of the framers of the constitution to adopt and preserve the remedy for all injuries to person or property which the common law afforded, they undoubtedly would have signified that intention by exact and specific wording, rather than the language used in article I, § 10." 149 Or at 346. (Emphasis in original.)

As the Supreme Court said in *Davidson v. Rogers*, 281 Or 219, 222, 574 P2d 624 (1978):

> "The language of the constitution does not specify that the remedy need be the same as was available at common law at the time of the adoption of the constitution; and the statute, *while restricting the remedy, does not abolish the cause of action*. Even though a retraction is not requested, the right of action still exists for an intentional defamation and, in any

---

[3] The Supreme Court has acknowledged the authority of the legislature to limit remedies for common law causes of action on a number of occasions. For example, in *Holden v. Pioneer Broadcasting Co. et al*, 228 Or 405, 365 P2d 845 (1961), *cert den* 370 US 157, 82 S Ct 1253, 8 L Ed 2d 402 (1962), the court held that statutes eliminating the right of a defamed person to receive damages for an inadvertent libel when a retraction was made were constitutional under Artice I, sections 8, 10 and 20, of the Oregon Constitution. *See also Noonan v. City of Portland*, 161 Or 213, 248, 88 P2d 808 (1939); *Evanhoff v. State Industrial Acc. Com.*, 78 Or 503, 154 P 106 (1915).

event, for recovery of specific demonstrable economic loss. Such limitation is not violative of Art. I, § 10, for the reason that *it does not wholly deny the injured party a remedy* for the wrong suffered." (Citations omitted; emphasis supplied.)

ORS 18.560 does not "wholly" deny plaintiff a remedy for his injury; it merely limits his recovery to all proven economic damages and up to $500,000 in noneconomic damages. Therefore, I would hold that ORS 18.560 is constitutional under section 10.

The call for judicial restraint in these kinds of matters was best expressed in 1882: "When there is nothing in the section of the constitution referred to inhibiting, expressly or impliedly, the power of the legislature to enact the law in question, * * * it is not therefore repugnant to that section." *Cresap v. Gray*, 10 Or 345, 349 (1882). Article VII (amended), section 3, Article I, section 17, and Article I, section 10, do not expressly or impliedly inhibit the legislature from setting statutory limitations on the amount of damages for which judgment can be lawfully entered. We should uphold the constitutionality of ORS 18.560 against plaintiff's attacks.

Richardson, C. J., and Deits and Landau, JJ., join in this concurring in part and dissenting in part opinion.