Argued and submitted January 31, affirmed March 14, 2007

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## CHRISTINE ANN MENDEZ,
*Defendant-Appellant.*

Lane County Circuit Court
200324084; A126177

*155 P3d 54*

Meredith Allen, Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Elizabeth A. Gordon, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum,* Judges.

HASELTON, P. J.

_____
* Rosenblum, J., *vice* Brewer, C. J.

## HASELTON, P. J.

Defendant, who was convicted of first-degree criminal mischief, ORS 164.365, appeals, challenging the trial court's imposition of restitution in an amount greater than $1,000. Defendant raises two arguments: (1) The trial court, in awarding restitution of $1,665.99, impermissibly "re-examined" a "fact tried by a jury," violating Article VII (Amended), section 3, of the Oregon Constitution.[1] Specifically, defendant contends that, because the jury had previously found, for purposes of determining the crime seriousness of defendant's offense, that the "value of the damage" caused by defendant's conduct was not "more than $1,000," the court was constitutionally precluded from awarding restitution in a greater amount. (2) Under the principles announced in *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), and *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), the determination of the amount of the victim's "economic damages" for purposes of restitution, ORS 137.106(1), should have been submitted to the jury.

---

[1] Article VII (Amended), section 3, of the Oregon Constitution provides:

"In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict. Until otherwise provided by law, upon appeal of any case to the supreme court, either party may have attached to the bill of exceptions the whole testimony, the instructions of the court to the jury, and any other matter material to the decision of the appeal. If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial; or if, in any respect, the judgment appealed from should be changed, and the supreme court shall be of opinion that it can determine what judgment should have been entered in the court below, it shall direct such judgment to be entered in the same manner and with like effect as decrees are now entered in equity cases on appeal to the supreme court. Provided, that nothing in this section shall be construed to authorize the supreme court to find the defendant in a criminal case guilty of an offense for which a greater penalty is provided than that of which the accused was convicted in the lower court."

As originally approved in 1910, Article VII (Amended), section 3, applied to actions at law where the "value in controversy" exceeded $20. That amount was later increased, by referendum, to $200 (in November 1974) and, finally, to $750 (in May 1996).

As amplified below, we reject both arguments. First, whatever the precise scope of the first sentence of Article VII (Amended), section 3, it is apparent, at least, that a court does not impermissibly "re-examine[ ]" a "fact tried by a jury" where the court *neither* abrogates the jury's finding *nor* determines the same fact inconsistently with the jury's finding. Here, the trial court did not abrogate the jury's finding for purposes of crime seriousness classification; rather, the court imposed sentence in accordance with that finding. Further, because the jury and the court applied different standards of persuasion—beyond a reasonable doubt and by a preponderance of the evidence, respectively—the latter's determination of the amount of damages was not inconsistent with the former's. Thus, there was no violation of Article VII (Amended), section 3. For the reasons stated in *State v. McMillan (A112613)*, 199 Or App 398, 402-03, 111 P3d 1136 (2005), we also reject defendant's second, *Blakely*-based challenge without further discussion. Accordingly, we affirm.

The facts material to our review are undisputed. On September 26, 2003, Price, who was driving a van, and defendant, who was a passenger in a truck, had an unpleasant interchange in a Wal-Mart parking lot in Springfield. Defendant and the driver of the truck took issue with Price's driving and began cursing her. After she got out of her van and walked toward the store, Price, concerned, kept an eye on the van. She saw defendant, with a key in her hand, approach the side of the van. Price called 9-1-1 and, after police and store security guards responded, she returned to the van. Running from the front left quarter panel, across both the driver's and passenger's doors, to the back left quarter panel was a fresh, "really deep scratch"—"the paint was gone." According to one of the investigating officers, Parrish, the scratch was not merely a "surface marking"; instead, "[i]t penetrated all the way through to the paint, down to the primer. And in spots it had hit metal."

Defendant was charged, by indictment, with criminal mischief in the first degree, ORS 164.365.[2] The

---

[2] ORS 164.365(1) provides, in part:

"A person commits the crime of criminal mischief in the first degree who, with intent to damage property, and having no right to do so nor reasonable ground to believe that the person has such right:

indictment further alleged that "the amount of loss caused by the defendant was more than One Thousand dollars ($1,000)." *See* ORS 135.711 (accusatory instrument "shall allege facts sufficient to constitute * * * a specific subcategory of a crime in the Crime Seriousness Scale established by the rules of the Oregon Criminal Justice Commission"). The significance of that additional allegation is that, if proved, it would increase the crime seriousness classification for defendant's offense from "2" to "3" for sentencing guidelines purposes. *See* OAR 213-017-0010(11) (if "value of the property stolen or destroyed" was $750 or more but less than $1,000, first-degree criminal mischief is a category "2" offense); OAR 213-017-0009(18) (damage of $1,000 or more but less than $5,000 yields a crime seriousness classification of "3").[3]

At trial, both Price and Parrish testified concerning the extent of damage. Price testified that, based on her "personal experience," the damage to the van was "more than $1,000."[4] Parrish testified, from his "life experience [with] cars that are keyed," that the process to repair such damage is "quite expensive" and "just a door itself could be about 650 to 700 dollars" and "a scratch that went from the driver's side door all the way to the rear of the car would be more than $750 worth of damage."

Because the amount of damage was determinative of the crime seriousness rating, that question was submitted to the jury. *See State v. Casavan*, 139 Or App 544, 546, 912 P2d 946, *rev den*, 323 Or 265 (1996) (crime seriousness category must be determined beyond a reasonable doubt); *State v. Moeller*, 105 Or App 434, 439, 806 P2d 130, *rev dismissed*, 312 Or 76 (1991) (same). Specifically, the court instructed the jury, *inter alia*, that, if it found that defendant was guilty of first-degree criminal mischief, it must then determine

---

"(a) Damages or destroys property of another:

"(A) In an amount exceeding $750[.]"

[3] Defendant's criminal history for sentencing guidelines purposes was "I." Under the sentencing guidelines, a "2-I" gridblock yields a presumptive sentence of 18 months' probation, while a "3-I" gridblock yields 24 months' probation.

[4] Price testified that the van had, in fact, been repaired, with costs related to repair, except for a deductible, covered by insurance. However, the court sustained an objection to a question regarding the actual cost of repair, and that matter was not developed further.

whether the state had proved the "additional allegation that the damages were $1,000 or greater" and that the state bore the burden of proving that allegation "to be true beyond a reasonable doubt." The court also submitted a special verdict form to the jury, which included the question, "Was the value of the damage more than One Thousand Dollars ($1,000)"? The jury convicted defendant of first-degree criminal mischief but answered the additional interrogatory in the negative.

The court subsequently sentenced defendant to 18 months' probation, in accordance with the jury's response to the special interrogatory.[5] That is, the court sentenced defendant consistently with the determination that the crime seriousness classification of her offense was "2," not "3." *See* 211 Or App at 315 n 3.

With respect to restitution, the state filed a restitution schedule, ORS 137.106(1), asserting a "[t]otal loss" of $1,665.99, including Price's insurance deductible, her rental car expense, and the cost of repair incurred by her insurer. Following trial, defendant lodged objections, arguing, in part, that (1) under *Blakely* and *Apprendi*, the court was precluded from awarding restitution in excess of $750; and (2) imposition of restitution of more than $750 would constitute an impermissible "re-examin[ation]" of a "fact tried by a jury," violating Article VII (Amended), section 3.[6] Defendant did not dispute the accuracy of the damages, as represented in the "restitution schedule."

The court ultimately ordered defendant to pay restitution of $1,665.99. In rejecting defendant's argument under Article VII (Amended), section 3, the court concluded:

"3. [T]he only evidence at trial in the case now before the court was that the damages exceeded $1,000 notwithstanding that the jury's verdict was that the state had not proved the 'over $1,000' allegation and that, consequently,

---

[5] As a condition of probation, the court imposed a 30-day jail term.

[6] Defendant also raised an objection based on issue preclusion. She does not renew that argument on appeal.

the Court can affirmatively say and find that there is no evidence to support the verdict on the issue regarding limiting the damages to less than $1,000;

"4. ORS 137.106(1) requires the Court, not the jury, to set the amount of restitution and requires the Court to 'include in the judgment a requirement that the defendant pay the victim restitution in a specific <u>amount that equals the full amount of the victim's pecuniary damages</u> as determined by the Court.' (Emphasis added.)"

On appeal, defendant reiterates her challenges under Article VII (Amended), section 3. Specifically, she argues that, because the jury explicitly determined, as a matter of fact, that the amount of damages caused by her criminal conduct was not "more than $1,000," the court, in imposing restitution in a greater amount, impermissibly "re-examined" that fact. The state responds first, that, as the trial court concluded, there was "no evidence to support the [jury's] verdict," because the only evidence presented to the jury established that the damages caused by defendant's conduct exceeded $1,000—and, thus, any "re-examin[ation]" was constitutionally permitted. Alternatively, the state contends that the jury's and court's functions, in determining crime seriousness and imposing restitution respectively, are so qualitatively distinct that the latter does not implicate "re-examin[ation]" of any fact found in relation to the former.

■ We reject, at the outset, the state's first argument. Contrary to the trial court's observation, there was evidence in the record—Parrish's testimony—from which the jury could find that damages from the "keying" incident were greater than $750 but less than $1,000. Again, Parrish testified that a scratch of this sort "would be [worth] more than $750"—not $1,000—in damage. *See* 211 Or App at 315. Nor would Parrish's testimony that it would cost $650 to $700 to repair the damage to one door compel the conclusion that repairing two doors would double the expense. Similarly, the jury was not obligated to accept Price's uncorroborated assertion that, in her "personal experience," the damages exceeded $1,000. We are unaware of any authority that a finder of fact, when confronted with such amorphous evidence of damages, is not permitted to discount (literally) that testimony.

The issue thus reduces to whether the court impermissibly "re-examined" a "fact tried by [the] jury." In answering that question, we must construe the operative first sentence of Article VII (Amended), section 3, applying the methodology for provisions adopted by initiative, as prescribed in *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 560, 871 P2d 106 (1994), which mirrors that of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993).[7] We begin with the text of Article VII (Amended), section 3:

> "In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

■ Several aspects of the text are significant for present purposes. First, it applies only to "actions at law," and criminal actions are "actions at law" for purposes of Article VII (Amended), section 3. *See State v. Wagner*, 305 Or 115, 168-69, 752 P2d 1136 (1988), *vac'd and rem'd on other grounds*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989).[8]

Second, in 1910—as today—"fact" could have variable meanings. A contemporaneous dictionary offered the following definition of "fact" in the legal context:

> "Any of the circumstances or matters of a case as they are alleged to be ; also, that which is of actual occurrence ; reality as an event or events. In this latter sense *fact* is often distinguished, in legal usage, from *law* ; the distinction being between the reality of events or things the actual occurrence or existence of which is to be determined by evidence, and the legal effect of the occurrence or existence of

---

[7] Article VII (Amended), section 3, was adopted by initiative in the November 8, 1910, general election.

[8] *Accord Westwood Corp. v. Bowen*, 108 Or App 310, 318, 815 P2d 1282 (1991), *rev dismissed*, 312 Or 589 (1992) (the court, in entering judgment for foreclosure of lien, did not impermissibly "re-examine[ ]" jury's finding of amount of damages recoverable for breach of construction contract. Although both were predicated on determination of a common factual issue, "[t]he Court did not reexamine a finding in an action at law; it made a separate finding in an equitable proceeding in which the jury's finding enjoyed no constitutional insulation * * *.").

such events or things as determined by the judicious application of the rules and principles of law. In general, questions of fact are for the jury, questions of law for the court. **A fact**, or **matter, in issue**, in legal procedure, is one raised by the pleadings and directly and necessary to be determined by the decision, so that it will become res adjudicata ; and it is distinguished from a **fact**, or **matter, in controversy**, which is any other fact collateral to the issue and controverted between the parties, such as evidential **facts** merely furnishing a basis for the verdict."

*Webster's New Int'l Dictionary* 782 (unabridged ed 1909) (italics and boldface in original). Thus, "fact" could mean either (a) the "occurrence or existence" of "events or things" or (b) more broadly, a disputed "matter" to be determined from the evidence.

Third, "re-examine[ ]" in contemporaneous common usage meant "to subject to reexamination," *Webster's New Int'l Dictionary* 1792 (unabridged ed 1909), and "reexamination," in turn, meant "a second examination." *Id. Accord Tenold v. Weyerhaeuser Co.*, 127 Or App 511, 520, 873 P2d 413 (1994), *rev dismissed,* 321 Or 561 (1995) (relying on 1976 dictionary definition of "reexamine" as "to subject to 'a second *or new* examination' " (quoting *Webster's Third New Int'l Dictionary* 1907 (unabridged ed 1976) (emphasis added))). "Examine" circa 1910 was defined, as pertinent, as "[t]o test by any appropriate method ; to inspect carefully with a view to discover the real character or state of[.]" *Webster's New Int'l Dictionary* 762 (unabridged ed 1909). Again, there is, at least, a reasonable ambiguity: Does "reexamine"—to subject to a "second examination"—connote (a) a review (and possible alteration or correction) of a prior determination, or (b) any subsequent and independent determination of the same "fact," or both?[9]

Those textual features render the constitutional text susceptible to more than one reasonable understanding, depending on whether "fact" and "re-examine[ ]" are construed broadly or narrowly. In particular, the citizens of Oregon, in approving Article VII (Amended), section 3, may

---

[9] We note, moreover, that the text provides that a fact shall not be "*otherwise* re-examined" (emphasis added). There is no apparent referent for "otherwise."

have intended to preclude judicial review and "correction" of legally proper verdicts, so long as there was any evidence to support the result. Or, more broadly, they may have intended to preclude courts in actions at law from determining any matter not submitted to a jury inconsistently with a jury's prior or concurrent determination of operative "common facts." The balance of Article VII (Amended), section 3, affords no contextual guidance, so we proceed to the measure's history. *See Ecumenical Ministries*, 318 Or at 560.

The content of the November 1910 General Election Voters' Pamphlet is unenlightening. There was only one statement submitted in favor of the measure, and none in opposition. Official Voters' Pamphlet, General Election, Nov 1910, 166-77. The sole reference that may relate to the purpose of the first sentence of the measure was that the measure was intended to

"remove the pretext for new trials in which substantial justice is done by the verdict and judgment, but in which the trial court may have made a technical mistake."

Voters' Pamphlet at 177. That statement is enigmatic—and, in all events, may relate more closely to the measure's third sentence.[10] It is, however, indicative of a general purpose of precluding judicial abrogation of "just" jury verdicts.

Subsequent decisions of the Oregon Supreme Court and of this court shed further light on the circumstances surrounding the measure's adoption—and, at least, one of its intended purposes. *See Van Lom v. Schneiderman*, 187 Or 89, 97-99, 210 P2d 461 (1949); *Tenold*, 127 Or App at 520-24; *see also* Hall S. Lusk, *Forty-Five Years of Article VII, Section 3, Constitution of Oregon*, 35 Or L Rev 1, 3-9 (1955). The gist of those discussions is that, at common law, a court could set

---

[10] That sentence reads as follows:

"If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial; or if, in any respect, the judgment appealed from should be changed, and the supreme court shall be of opinion that it can determine what judgment should have been entered in the court below, it shall direct such judgment to be entered in the same manner and with like effect as decrees are now entered in equity cases on appeal to the supreme court[.]"

aside a jury's damages award as "excessive," and grant a new trial, if it concluded that the verdict was "clearly against the weight of the evidence," *see Van Lom*, 187 Or at 112, or was the product of "passion or prejudice," *id.* at 97. *See also Tenold*, 127 Or App at 521. The first sentence of Article VII (Amended), section 3, was intended—at least in part—to deprive the courts of that authority:

> "When [the framers of Article VII (Amended), section 3] substituted in the place of that exception the words, 'unless the court can affirmatively say there is no evidence to support the verdict', they in effect declared their purpose to eliminate, as an incident of jury trial in this state, the common law power of a trial court to re-examine the evidence and set aside a verdict because it was excessive or in any other respect opposed to the weight of the evidence."

*Van Lom*, 187 Or at 99.

That description in *Van Lom* comported with earlier decisions of the Oregon Supreme Court, which described the court's contemporaneous understanding of the provision's purpose:

> "In order to inhibit such practice and to uphold verdicts, the Constitution was amended so as to preclude a court from re-examining any fact that had been tried by a jury, when the verdict returned was based on any legal evidence.
>
> "That part of Article VII of Section 3 of the fundamental law, which prohibits a court from re-examining any fact tried by a jury, when the verdict is based on legal evidence properly admitted, should be so construed as to effectuate the purposes and objects that evidently induced the amendment."

*Buchanan v. Lewis A. Hicks Co.*, 66 Or 503, 510, 134 P 1191 (1913) (citations omitted).

In sum, the primary—and, perhaps, exclusive—purpose of the first sentence of Article VII (Amended), section 3, was to preclude courts from reexamining and setting aside jury verdicts based on a judicial assessment of the weight and persuasiveness of the evidence. Nevertheless, the fact that such judicial abrogation may have been the focus of the provision does not necessarily preclude the possibility that the provision might have broader preclusive application. That is,

Article VII (Amended), section 3, *might* also operate to constitutionally prohibit courts, in determining other matters in actions at law, from independently finding "common facts" inconsistently with a jury's determination of the same "facts."

Textual ambiguity aside, there is no indication that the electorate in 1910 contemplated—much less intended—such a result. "Actions at law" in which the jury and the court act concurrently or sequentially as independent triers of common facts are rare.[11] Certainly, in the world before *Blakely*, Oregon voters would have understood the court and the jury to have distinct functions with respect to facts pertaining to sentencing.

■    In all events, we need not proceed to the third level of the *Ecumenical Ministries/PGE* inquiry to resolve any even arguable ambiguity that remains after our review of the circumstances attending the measure's enactment. That is so because here, the court, in imposing restitution, did not either abrogate the jury's verdict, specifically including its finding of the amount of damage for purposes of crime seriousness classification, or determine the amount of damage inconsistently with the jury's finding.

As noted, the court imposed sentence under the guidelines based on a crime seriousness rating of "2." 211 Or App at 316. That accorded with the jury's finding that the amount of damage resulting from defendant's crime was less than $1,000. Thus, the court did not review and set aside the jury's finding in that regard based on its own assessment of the evidence. Rather, the jury's determination was given full force and effect.

■    Nor was the court's finding inconsistent with the jury's. Each independently determined the amount of damage applying a different standard of proof. As noted, *see* 211 Or App at 316, the jury applied the "beyond a reasonable doubt" standard, while the court applied the "preponderance of the evidence" standard.[12] Just as a single trier of fact could,

---

[11] We have not undertaken to determine the incidence, or coincidence, of such actions circa 1910.

[12] We are unaware of any reported Oregon decision that states explicitly that the applicable standard of proof for the imposition of restitution is a "preponderance of the evidence." Nevertheless, the procedural requirements for imposition of restitution are those "ordinarily associated with sentencing[.]" *State v. Dillon*, 292

upon applying different standards of proof, render different findings of the same fact without any inconsistency, the same is true of different triers of fact applying different standards of proof.

The trial court's imposition of restitution did not violate Article VII (Amended), section 3.

Affirmed.

---

Or 172, 180-81, 637 P2d 602 (1981), and, with the exception of those sentencing matters that are subject to *Blakely* and *Apprendi*, sentencing determinations are generally made by a preponderance of the evidence. *See, e.g.*, ORS 137.079(5)(c) (state has burden of proving by preponderance of evidence any disputed part of the defendant's criminal history as provided in the presentence report); *cf. State v. Donovan*, 305 Or 332, 335, 751 P2d 1109 (1988) (because probation revocation hearings do not usually adjudicate guilt or innocence of a criminal offense, burden of proof is preponderance of the evidence). Further, applying a preponderance of the evidence standard in determining the amount of damages implicitly and logically comports with the design of the restitution statutes, which, in several essential features, parallel the procedures for recovery of economic damages in civil actions.